Argued March 9; affirmed July 6; rehearing denied
September 7, 1938

# CARY ET AL. *v.* CARY

(80 P. (2d) 886)

Department 2.

*L. A. Liljeqvist*, of Marshfield (Swanton & McKeown, of Marshfield, on the brief), for appellant.

*F. E. McCracken*, of Coquille (Murphy & Skipworth, of Marshfield, on the brief), for respondents.

LUSK, J. This is an appeal from a decree granting relief to plaintiffs in a suit to establish a trust, for an accounting, and other relief.

Mary Cary, the respondent, who will be referred to as the plaintiff, and the appellant, Leo. J. Cary, who will be referred to as the defendant, are husband and wife. They were married June 8, 1909, in the state of Michigan. Seven children were born to them, five of whom were alive at the time of the commencement of this suit on November 7, 1934. Two of the children at that time were minors.

The couple came to Oregon in 1911 and located in Coquille, in Coos county. On December 20, 1911, they opened a set of books, the first entry in which comprised an itemization of their resources and liabilities. This book showed ''present worth'' of Mr. and Mrs. Cary on that date in the sum of $29,312.19. Of that amount, cash and properties of the value of at least $25,942 were contributed by the plaintiff.

From that time until the commencement of this suit, Mr. Cary had possession and control of, and managed, invested, and re-invested the properties and monies of himself and his wife. Her contribution to their united capital greatly exceeded his in value, most of it being derived from the estate of her father, William Coach. Mr. Coach died in 1911 and in May, 1912, Mrs. Cary received as her share of his estate, property of the appraised value of $100,637.56, the major items of which were shares of stock in the Coach Timber Company, a corporation, an interest in unsecured notes of Cody Lumber Company, a corporation, and timberlands in Douglas and Lane counties, Oregon.

The business operations conducted by the defendant were in large part unsuccessful, and for that and other reasons the value of the property in his care had greatly diminished by the year 1934.

Mr. and Mrs. Cary lived in harmony until about the year 1929, when Mrs. Cary suffered an illness. This was the beginning of a mental disturbance which progressed to the point that insanity proceedings were commenced against her and while the instant case was pending she was adjudicated an insane person, suffering from paranoia. Because of that adjudication, Dennis McCarthy was appointed her guardian ad litem and made a party plaintiff herein.

The second amended complaint alleges in substance that the plaintiff's properties and funds and the increment therefrom which came into the defendant's possession were turned over to him to invest, care for, and manage on the plaintiff's behalf, and that the defendant is accountable to her for such funds and other properties as a trustee. The prayer of the complaint is that after an accounting is taken the defendant should be required to turn over to the plaintiff all funds and properties, both real and personal, received by him from the plaintiff, together with the proceeds of investments of funds or business transactions into which plaintiff's funds entered; that the defendant be required to convey to the plaintiff all real estate standing in his name and acquired from plaintiff with plaintiff's funds; and that judgment be given against the defendant for all funds of the plaintiff used or lost by the defendant for his purposes or in his own business transactions and not now in defendant's possession or under his control.

The defendant in his answer denied the existence of a trust and alleged that any funds or properties of his wife which came into his possession were given to him by her. He alleged further that he was entitled to be paid a salary of $500 per month for his services in managing his wife's property and business, and pleaded laches and the statute of limitations.

The case was heard before the Honorable James T. Brand, circuit judge, who appointed Mr. Keith Leslie, a certified public accountant, as referee to examine the accounts of the parties, take testimony, and make and state an account between the parties. After the report of the referee had been received and a trial had before the court, the circuit judge filed his written opinion, which by stipulation of counsel was made a part of the record, and subsequently made and entered findings of

facts and conclusions of law, and a decree in harmony with the views stated in such opinion.

Apart from certain real properties standing in the names of the plaintiff and the defendant as tenants by the entireties and a small block of stock in Coach Timber Company, the circuit court found that the corpus of Mrs. Cary's estate which came into the defendant's possession and control, was received by him as agent and trustee and that he was accountable therefor, but that he was not chargeable with income used for the support and maintenance of the family. The defendant was not allowed salary as such. Based upon the report of the referee, which, except for minor particulars, was accepted by the parties as correct, the circuit court determined the percentages of original capital which each of the parties contributed to their united properties, and applying those percentages to the assets still remaining, made a division and allocation of such assets along equitable lines, giving due consideration to the situation of the parties.

■■ The case as it comes to us has narrow limits. The charge in the complaint that Mr. Cary was guilty of misconduct or misappropriation in the handling of his wife's separate estate is not supported by any credible evidence and need not be further noticed. Large sums of money were lost in the business enterprises initiated and carried on by the defendant, but it is not shown that he was wanting in diligence or capacity. The defendant kept accurate books of account and up to the time of the beginning of her mental ailment in January, 1931, Mrs. Cary was fully advised of all investments and of the details of the business in which her money was being used. If Mr. Cary was a trustee for her, as we are satisfied he was, and if he invested her money in ways which would not, under ordinary

circumstances, meet the test for the proper investment of trust funds, he is nevertheless not liable for resulting losses, since Mrs. Cary was *sui juris*, and with full knowledge of the facts, gave her consent and approval to his acts: *Carpenter v. Carpenter*, 153 Or. 584, 605 (56 P. (2d) 305, 57 P. (2d) 1098, 58 P. (2d) 507, 105 A. L. R. 386).

The circuit court held and decreed that the Coquille home of the parties, a parcel of land in Coos county known as the Dutch John Farm, and another parcel of land in Coos county known as the Apple Ranch are held by the plaintiff and defendant as tenants by the entireties. There can be no question upon the record but that these real properties held by the entireties were so taken by the parties on the advice of the late Andrew J. Sherwood, an attorney of Coquille, and because, as Mr. Cary testified "we wanted things fixed in case we died so that the other would receive that property without any unnecessary litigation." The deeds express the actual intention of the parties and the title should not be disturbed.

We come then to the decision of the principal question in the case, namely, whether monies and other properties turned over to the defendant by his wife were gifts to him, or whether he is accountable therefor as a trustee.

The plaintiff and defendant were married in Grand Rapids, Michigan, and continued to live there for nearly two years after their marriage. Defendant was then a clerk with a furniture company. Later, with the aid of $1,500 given him by Mrs. Cary, according to her testimony, (though he denied this) he purchased an interest in a corporation known as Knee Heating Company, for which he worked at a small salary until they came West.

William Coach, father of the plaintiff, died intestate in Coos county, Oregon, in April, 1911, leaving an estate of the appraised value of $220,094.67. Upon his death Mr. and Mrs. Cary moved to Oregon and took up their residence in Coquille. Plaintiff and her two brothers, Joseph W. Coach and Arthur H. Coach, were the sole heirs at law of their father. With the exception of $4,000, the plaintiff's entire distributive share of the estate came into her hands on May 6, 1912, and according to journal entries made by the defendant on May 7, 1912, was worth at that time the sum of $100,637.56. The largest items were 95,986 shares of Coach Timber Company stock, appraised at $47,993, a one-third interest in $76,091.23, face value, secured notes of Cody Timber Company, of the appraised value of $24,697.07, and an interest in lands in Douglas and Lane counties of the appraised value of $17,000. The other properties were stocks in various corporations, and one-third interests in a steamboat, a ranch, and a timber claim, respectively.

The defendant assisted in the business of settling the estate of William Coach. On June 3, 1912, he and his wife were elected directors of Coach Timber Company and on June 22, 1912, Mrs. Cary was elected president and Mr. Cary was appointed secretary-treasurer. Mrs. Cary was also at this meeting elected general manager, though from that time the defendant was actually the manager of the company.

There stood in the defendant's name at this time 4,900 shares of the 300,000 shares of the capital stock of Coach Timber Company, which plaintiff had owned before her father's death. The defendant testified, and plaintiff corroborated him, that these shares were a gift from the plaintiff; that she gave him 5,000 shares, and he returned to her 100 shares.

From that time forward the defendant managed his wife's business and controlled, invested, and re-invested her funds after adding to them his own meagre resources. Monies were kept in the bank in his name or in joint accounts, stocks were bought in his name, and some real estate taken in his name. Large sums were checked out for business and family purposes, most of the withdrawals being made by checks issued by the defendant.

The family lived on a scale commensurate with their means, not extravagantly, but comfortably. They had automobiles, travel, and the children were sent to good schools. It was a harmonious family until Mrs. Cary's illness.

The capital contribution of the plaintiff as found by the referee was as follows:

| Property Contribution of Mary E. Cary | Original Set Up Value | From Estate of Wm. Coach |
|---|---|---|
| Cash Proceeds | $ 7 067.00 | $ 10 491.24 |
| Coquille Tow Boat Co. stock | – | 1 666.66 |
| Steamer Bandon | – | 750.00 |
| Moorehouse Parish Lands | 7 500.00 | – |
| Cody Lumber Co. notes | – | 24 697.07 |
| Grand Rapids Home | 5 000.00 | – |
| Coach Ranch Livestock, etc. | – | 600.00 |
| Household Furnishings | 2 000.00 | – |
| Coach Ranch | – | 1 600.00 |
| Coach Timber Co. stock | 4 000.00 | 47 993.00 |
| Cody Lumber Co. stock 1/3 share | – | 9.00 |
| Tonopah of Nevada Mining Co. stock | 375.00 | 2 947.50 |
| Ash Bed Mining Co. stock | – | 50.00 |
| Union Copper Land and Mining Co. stock | – | 1.00 |
| Rheingold Mining Co. stock | – | 833.33 |
| Douglas and Lane County Lands | – | 19 500.00 |

The capital contribution of the defendant as found by the referee was as follows:

*Property Contribution of Leo J. Cary*

| | | |
|---|---|---|
| Knee Heating Co. ½ interest | $ 2 000.00 | $ — |
| John Cary Estate - cash | 2 000.00 | — |
| - notes | 1 500.00 | — |
| Rheingold Mining Co. stock | 500.00 | — |
| Tonopah of Nevada Mining Co. stock | 375.00 | — |

In addition to the above, there was a joint contribution of Cody Lumber Company stock appraised at $50, and another of $2,455.19, the source of which could not be determined.

The valuations of plaintiff's properties set out in the above list under the heading "original set up values" are taken from a journal opened by the defendant on December 20, 1911, and which contains the following in the defendant's handwriting:

"Mr. and Mrs. Leo J. Cary of Coquille, Oregon, having decided to open a set of books this day and year first above written, find they have on hand the following resources and liabilities."

This is followed by a list of the properties and monies with valuations as stated above. Mrs. Cary received the distributive share of her father's estate of May 6, 1912. Previously she had received an advance of $4,000. These assets, with valuations as fixed by the defendant as above, were likewise entered on the books by Mr. Cary.

The total of her contribution thus valued, is $134,-195.80 and of his, $6,375.

Some of these valuations proved to be erroneous. Out of the Cody Lumber Company notes set up at $24,697.07, only the sum of $4,279.58 was realized. On the other hand, the net proceeds of the sale of the

lands of the plaintiff in Douglas and Lane counties, set up at $19,500, were $44,489.40, and the net proceeds of the sale of her Moorehouse Parish Lands, set up at $7,500, were $27,452.58. The notes of the John Cary estate included in the contribution of the defendant and set up at $1,500, proved to be worthless.

The total final contribution of the plaintiff, ascertained by adding to the original set up values, profits from sales, income from dividends, and other sources, and deducting costs and losses, amounted in cash to $133,396.62; while that of the defendant amounted to $4,691.25.

These computations and results reported by a careful and competent accountant, after hearing the testimony of the defendant and examining the books of account and other records kept by him, have not been criticized by either of the parties on this appeal. They furnished the basis of the circuit court's finding that the original capital contribution of Mrs. Cary amounted to $117,839.80, and that of Mr. Cary $6,027.22. (This does not take into consideration salary earned by the defendant for which he was given credit as a contribution to capital and which will be noticed presently.) Neither in his brief nor in the oral argument in this court has the defendant taken any exception to this finding. We approve it. It is certainly as favorable to the defendant as, in view of the conceded facts, he has any right to expect.

As stated, stocks and other properties were from time to time purchased and placed in the defendant's name. The money came from what is referred to in the testimony as the "common pot", that is, the combined resources of Mr. and Mrs. Cary. At the time of the trial in the circuit court the properties which stood in

the name of Leo J. Cary and their book values were as follows:

| | |
|---|---:|
| Bills receivable | $ 3 950.00 |
| Houghten County, Michigan lands | 672.80 |
| Logged off lands | 100.00 |
| 10,000 shares Coach Timber Co. stocks | 10 891.00 |
| 700 shares Tonapah of Nevada Mining Co. stocks | 1 400.00 |
| First National Bank of Coquille stock | 650.00 |
| Kokeel Kanue Klub stock | 502.33 |
| Coos Country Club stock | 100.00 |
| Pacific International Livestock Exposition stock | 30.00 |
| Two automobiles | 700.00 |
| Coos Cedar Co. stock—297 shares (par value) | 29 700.00 |

Additional personal property consisted of a horse and outfit, valued at $100 and cows at $150, which the defendant claimed. There was also a small amount of cash in the bank to the account of the defendant.

 The Coos Cedar Company stock will be considered later. As to the other properties, the defendant, in our opinion, has failed to prove that any part of them, except some of the Coach Timber Company stock, were gifts from his wife. Whatever may be the rule in other jurisdictions, this court is committed to the doctrine that whenever a husband acquires possession of the separate property of his wife, whether with or without her consent, he must be deemed to hold it in trust for her benefit in the absence of any direct evidence that she intended to make a gift of it to him: *Rhodes v. Peery*, 142 Or. 165, 173 (19 P. (2d) 418), and cases there cited; *Stickney v. Stickney*, 131 U. S. 227, 239 (33 L. Ed. 136, 9 S. Ct. 677); *Parrett v. Palmer*, 8 Ind. App. 356 (35 N. E. 713, 52 Am. St. Rep. 479); *Jones v. Davenport*, 44 N. J. Eq. 33 (13 Atl. 652, 659); 30 C.

J. 708, § 305; 13 R. C. L. 1387, § 437; *Etheredge v. Cochran*, 196 N. C. 681 (146 S. E. 711); *Jent's Executors v. Dodson*, 220 Ky. 181 (294 S. W. 1052).

■■ In *Stickney v. Stickney*, supra, the court referred to the case of *Bergey's Appeal*, 60 Pa. 408 (100 Am. Dec. 578). Bergey received money belonging to his wife, being her patrimonial portion, in her presence, and both united in the receipt for it. Not a word was spoken by his wife when her husband took up the money to count it and put it in his pocket, nor was a word ever heard afterwards to the effect that the wife had made a gift of it. The husband appropriated it to the purchase of a farm, and the Supreme Court of Pennsylvania held that no inference could arise of a gift from the transaction detailed, observing that ''she was not bound to attempt rescue of it from him or proclaim that it was not a gift. She might rest on the idea that his receipt in her presence was with the intent to take care of it for her.'' The presumption of a trust arising in such cases has not been overcome by any evidence in the record before us. The defendant, in his testimony, did not even claim a gift. Instead, he testified, in answer to a question propounded by his own counsel, that there was no understanding as to how the properties were to be handled after he acquired possession of them, that ''we didn't have any understanding, other than that we were married.'' Apart from curtesy in her real estate, their marriage, it is needless to say, gave the defendant no rights in his wife's separate property: Oregon Const. Art. XV, § 5; §§ 33-202, 33-211, 33-215, Oregon Code 1930; *Lane v. Myers*, 70 Or. 376 (141 P. 1022, Ann. Cas. 1915 D, 649). As we have seen, the defendant testified directly and postively that Mrs. Cary made a gift to him of 5,000 shares of Coach Timber Com-

pany stock. The absence of similar testimony respecting the other properties emphasizes the defendant's failure to sustain the burden of proof assumed by him.

■ The defendant had no agreement with his wife for the payment of compensation in consideration of services rendered by him in the management of her separate estate. His services were voluntarily given and there is no obligation on her part to pay him: *Lewis v. Johns*, 24 Cal. 98 (85 Am. Dec. 49); *Deere, Wells & Co. v. Bonne*, 108 Iowa 281 (75 Am. St. Rep. 254, 79 N. W. 59); *Smith v. Johns*, 154 Ky. 274 (157 S. W. 21); *Broadwater v. Jacoby*, 19 Neb. 77 (26 N. W. 629); *Olson v. O'Connor*, 9 N. D. 504 (84 N. W. 359, 81 Am. St. Rep. 595); 30 C. J. 859, § 540; 13 R. C. L. 1157, § 183.

■ The circuit court, nevertheless, in determining the respective capital contributions of the parties, gave credit to the defendant for a certain portion of salary received by him over the period of twenty-three years during which he was managing his wife's separate estate, and the affairs of the corporations in which she was a stockholder. This salary amounted to $37,964.53. It was the view of the circuit court that had the defendant not been so engaged, his earning capacity no doubt would have been greater. The rule was stated that "a husband's duty to provide his wife with support is measured with reference to his pecuniary ability and according to his station in life." (See 30 C. J. 520, § 34). And the defendant's station in life was said to be "that of a man engaged by mutual consent in the management of the property of his wife." On this basis the sum of $1,000 a year for twenty-three years was found to be a reasonable sum to charge to the defendant for family expenses, and after deducting $23,000 from the amount of salary received by the de-

fendant, the remainder, $14,964.53, was treated as an additional capital contribution on his part. His total capital contribution was, thus, brought to $21,036.75, or 15.15% of the whole, Mrs. Cary's contribution being 84.85% of the whole.

■ The defendant, in his brief, has called our attention to some of the authorities which hold that a different rule prevails with reference to the corpus or principal of money or property belonging to the wife which the husband receives and with respect to the interest or income. As to the former, as we have already stated, the presumption is that the husband takes such property as a trustee, but as to the interest or income, it is held that if the husband receives the interest or income and spends it with her knowledge and without objection, a gift will be presumed: 30 C. J. 709, § 305½; *T. G. W. Realties v. Long Island Bird Store*, 151 Misc. 918 (272 N. Y. S. 602, 607); *Jones v. Davenport*, supra; *Parrett v. Palmer*, supra; *Spalding v. Spalding*, 361 Ill. 387 (198 N. E. 136, 631); 101 A. L. R. 433, with annotation at page 432.

Thus, it is said in *T. G. W. Realties v. Long Island Bird Store*, supra:

"Where a wife permits her husband to collect all the income from her separate estate and use it for his own purposes or to pay the household and family expenses therefrom, a gift of the income from the wife to the husband is presumed to have taken place. She cannot later demand that he account to her for it. She is not permitted to induce her husband to maintain a standard of living based upon her consent that he keep and use the income and then revoke that consent and insist that he return it. The injustice which would result from such conduct is amply demonstrated by the facts in this very case. This rule is founded not in technical consideration of waiver or estoppel but rather

on equitable considerations of justice and fair play, and has been followed by the courts of this and many other states.''

■ The circuit court recognized the existence of this rule and applied it. The proof showed that the total family expenses during the twenty-three year period were in excess of $97,000. The income from the properties of both parties was $44,480.75, so that there was an excess of family expenses over both salary, as charged to the defendant, and income, in the amount of more than $29,000. The defendant was not required to account for the income, but on the contrary was given credit for all of it, in accordance with the rule which he invokes. He, therefore, has no ground for complaint on that score.

In the distribution and allocation of the assets, as well as of certain liabilities, amounting to about $7,500, the circuit court did not attempt to make a division which would be mathematically accurate. The court said in its opinion:

''We now come to a most perplexing problem. We have arrived at substantially the relative interests of the parties in the mass of the property, but the property is not an indistinguishable mass, it is separate and individual properties, lands, capital stocks, accounts receivable, vehicles, livestock, and so forth. As indicated, the apportionment is not strictly mathematical, but is the result of judgment, and in order to do justice to the parties, judgment must be further exercised in determining which of the various properties shall belong to the respective parties. In making such apportionment, the court must seek that method which in equity will best serve the substantial interest of both parties in view of their circumstances, and, which will also, the court hopes, best serve the contingent interest of the children of the parties, who are the innocent victims of this tragic contest.''

Neither in the defendant's brief nor oral argument has there been any criticism of the method employed by the circuit court, nor of specific awards, save as to three items, which will be discussed. Almost the whole insistence on the defendant's part has been that he is entitled to keep everything that he has received. That contention has already been disposed of.

The defendant complains of the allotments of Coos Cedar Company stock, an account receivable of that company in the sum of $10,982.44, and of Coach Timber Company stock.

Coos Cedar Company is an Oregon corporation, organized in February, 1923, by the defendant to engage in general logging operations. The authorized capital stock was $30,000 with shares of the par value of $100 each. The defendant subscribed to 152 shares, and Ira Johnson and W. E. Craine to 74 shares each. The principal, if not only, business in view at the time of organization was the purchase and logging of timber from Coach Timber Company. The Coos Cedar Company lost money, but its stock still has some value. At the present time 297 shares stand in the name of Leo J. Cary, and one each in the names of W. E. Craine, John Francis Cary, and Florence E. Cary. The report of the referee states: "The personal records of Mr. and Mrs. Leo J. Cary indicate that the entire original stock issue was paid for from funds drawn from their bank account." The books tend to support this statement, but the defendant testified, without contradiction, that he paid for his stock with money he borrowed from the bank. He and Mrs. Cary signed the notes for a total sum of $30,000. Cary paid $15,200 for his shares and loaned Craine and Johnson the money to pay for their's, but later was compelled to take over their stock when they failed to repay the loans. The notes given by Mr.

and Mrs. Cary were repaid with the proceeds of the sale of logs purchased from the Coach Timber Company.

The Coos Cedar Company now owes the Coach Timber Company for stumpage the sum of $12,248.80 and owes the parties to this suit more than $10,000. The value of its assets, mostly old logging equipment, is problematical.

The defendant asserts that the circuit court was in error in awarding a portion of this stock to Mrs. Cary. He claims that it was his money which paid for the stock.

We think that this position cannot justly be maintained. If we disregard form and look to the substance of things, it must be concluded that the money used in the purchase of the stock of Coos Cedar Company came from the same source as the rest of the properties. Mrs. Cary signed the notes with her husband. She took the risk. If it was not her credit which enabled her husband to get the money from the banks, then it was his possession and apparent ownership of her property which established his credit.

The circuit court awarded 14,900 shares of Coos Cedar Company stock to the plaintiff and 15,100 shares to the defendant. We think this an equitable distribution. It gives the defendant control of the corporation with an opportunity to employ his business experience and ability in the endeavor to save something out of this joint venture. It gives her a fair share in whatever may be left of an enterprise which her resources made possible.

The books disclose that Coos Cedar Company was indebted to Leo J. Cary and Mary E. Cary on an account in the sum of $10,982.44. This account was awarded by the circuit court to the plaintiff. It is for

advances made to the corporation. The only place from which such advances could have come is the so-called "common pot", and no error was committed in so treating it.

■ As stated, Mrs. Cary gave 5,000 shares of Coach Timber Company stock to her husband. This was on July 20, 1911. It was stock held by Mrs. Cary in her own name before her father's death. The corporation was then capitalized at $300,000, each share having a par value of $1. On October 10, 1911, Mr. Cary returned 100 shares to Mrs. Cary to enable her to continue as a stockholder in the corporation. In 1915, Cary gave ten shares each to L. H. Hayard, L. Harlocker, and J. A. Lamb. In the meantime he had acquired ten shares from Walter Sinclair, thus leaving him with 4,880 shares. On June 14, 1918, the capital stock was reduced to $30,000, thus reducing the number of shares which the defendant held to 488. Prior to that time, however, he bought 5,000 shares from D. C. Gibson, and subsequently other shares were bought up, some of which were taken in Mr. Cary's name, so that at the present time, according to the books, he is the holder of 10,000 shares. The evidence establishes that all shares standing in his name in excess of 478 were bought by him with Mrs. Cary's money and in equity belong to her. She appears on the books as the owner of 19,499 shares, but the circuit judge awarded her 29,399 shares and awarded Cary 100 shares. The circuit judge said, in his opinion, that the defendant from the gift of stock made to him by Mrs. Cary, "distributed shares to various other persons, with the result that he now owns only 100 shares (after the reduction of the capital stock of the company) of the book value of $111.11." We are unable to find from the evidence that the defendant distributed any of his stock except 100 shares to Mrs.

Cary and thirty to the other three individuals above named, before the reduction in the capital stock. Notwithstanding this slight error—which could affect the final result hardly at all—we are of the opinion that no modification of the decree is called for.

The book value of the assets awarded to the plaintiff is $72,543.87; that of assets awarded to the defendant is $19,433.99; liabilities were distributed as follows: to the plaintiff, $2,516.01; to the defendant, $5,016.01. The plaintiff was relieved of a part of her proportionate share of the liabilities because she is not in a position to liquidate her assets, and in consideration of the corresponding increase in liabilities distributed to the defendant, his assets were increased. They were further augmented because of the doubtful value of bills receivable which were alloted to him. Each of the parties was given assets which, according to the books, approximated in value the share of the whole to which each was entitled on the basis of their original capital contributions. Certain adjustments were made which seemed to be demanded by the peculiar situation of the litigants, and in certain instances, as, for example, the account receivable above referred to owing by Coos Cedar Company, and bills receivable in the amount of $3,950, the entire individual asset was awarded to one or the other of the parties, instead of making an attempt to divide it between them.

Except as above indicated, none of the details of the findings or decree have been criticized in the brief or oral argument of the defendant and we, therefore, see no occasion for further discussion of specific items. It was the difficult duty of the circuit court to unravel the tangled skein of the business and property affairs of the litigants. From a careful examination of the record we are satisfied that that duty was discharged

with due regard to the evidence and to controlling legal principles and in a spirit of equity and justice, and that the decree as made should stand as a fair and sensible adjudication of the rights of the parties.

 The defendant urges that the suit is barred by the statute of limitations and laches. In *Banfield v. Schulderman,* 137 Or. 256, 278 (299 P. 323, 3 P. (2d) 116), this court held that where a transaction between husband and wife is involved the statute of limitations does not apply. We are now asked by counsel for defendant to reconsider and abandon the doctrine so announced, which is said to be erroneous because the legislature, in 1915, eliminated from § 17 of Lord's Oregon Laws the fourth subdivision thereof, which suspended the running of the statute of limitations in actions by married women for a certain period during "such disability": Laws 1915, Chap. 30. See § 1-201, Oregon Code 1930. An examination of the briefs in *Banfield v. Schulderman,* supra, discloses that the change in the statute was called to the court's attention by counsel in that case, and the wealth of judicial authorities cited in the opinion indicates the careful attention given the question by the court. One of these cases is *Charmley v. Charmley,* 125 Wis. 297 (103 N. W. 1106), 110 Am. St. Rep. 827, in which the court adhered to its prior rulings, some made before and some after the repeal of a Wisconsin statute exempting actions by married women from the operation of the statute of limitations. The doctrine that the statute of limitations did not apply to suits where a transaction between husband and wife is involved was declared to have become a rule of property. Another case cited is *Morrish v. Morrish,* 262 Pa. 192 (105 Atl. 83), in which the court said:

"The best considered decisions upon the subject in hand, ever since the Married Women's Property

Acts are to the effect that owing to the social importance of maintaining the family relation in suits between a wife and her husband for the protection of the former's property, statutes of limitation, as also presumptions or estoppels by elapse of time do not ordinarily affect the rights of the wife, since she cannot be expected to treat her husband as a stranger; as certain courts have well said, any other policy would be apt to beget disagreements and contentions in a family fatal to domestic peace.'' (Citing authorities.)

Again in *Bennett v. Finnegan*, 72 N. J. Eq. 155 (65 Atl. 239), the court said:

''The basis of the rule is the general policy of preventing litigation between husband and wife.''

In the last cited case the rule was applied in favor of the husband in a suit brought by him.

It is evident that whether the doctrine of *Banfield v. Schulderman*, supra, be sound or not, it takes its root in considerations of public policy and is quite independent of statutory provisions with regard to the disabilities of coverture. It is also evident that the court in that case announced its conclusion after deliberate consideration of the course of legislation in this state on the subject, of the authorities, and of the reason of the rule. As in Wisconsin, the decision has become a rule of property that we think should not be disturbed.

■ The same reasons that make the statute of limitations inapplicable also compel the holding that this suit is not barred by laches of the plaintiff. See 17 R. C. L. 965, § 334, and 13 R. C. L. 1405, § 454.

The following language from *Rhodes v. Peery*, supra (142 Or. 178), is pertinent to this phase of the case:

''Neither do we think the defense of laches is tenable * * * No element of estoppel is involved.

Rachel and her husband lived together in peace and harmony and it was not incumbent upon her to institute a suit for the purpose of declaring a trust against one in whom she no doubt had implicit confidence.''

The decree of the circuit court is affirmed. Each of the parties will pay his own costs and disbursements in this court.

BEAN, C. J., and RAND and BAILEY, JJ., concur.