# Ellen Johnson Griffin

## v.

# William R. Griffin and Bank of Waterbury

[217 A.2d 400]

June Term, 1965

Present: **Holden, C. J., Shangraw, Barney, Smith and Keyser, JJ.**

Opinion Filed October 5, 1965

Opinion on Reargument Filed February 25, 1966

426

*Theriault* and *Joslin* and *John A. Burgess* for plaintiff.

*Charles J. Adams* for defendant bank on original appeal; *Black and Plante,* with *Frank G. Mahady* on the brief, for defendant bank on reargument.

**Smith, J.** This is an action brought by Ellen Johnson Griffin against her husband, William Griffin and the Bank of Waterbury under the Declaratory Judgment Act. The action was brought by Ellen Griffin to determine the validity of certain notes and assignments held by the Bank of Waterbury and signed by the petitioner. The defendant Bank of Waterbury has brought its appeal here from the Decree of the Washington County Court of Chancery.

The facts found by the chancellor, none of which were excepted to here, disclose the following factual situation:

Ellen Griffin and defendant William R. Griffin were husband and wife, although since about June 1, 1960, they had been living apart, and a divorce action brought by the petitioner against her husband had been pending in the Washington County Court since July, 1960, at the time of hearing.

Prior to November 15, 1959, Ellen Griffin, her husband and his mother and father were indebted to the Bank of Waterbury by reason of notes and mortgages as follows:

a. A note in the original amount of $800.00 dated March 2, 1956, and signed by Dennis Griffin and Ina Griffin, and by Ellen and William Griffin.

b. A note in the original amount of $7,200.00, dated March 2, 1956 and signed by Ellen and William.

c. A note in the original amount of $379.00, dated October 18, 1957, and signed by Ellen and William.

d. A note in the original amount of $1,485.53, dated December 16, 1958, and signed by Ellen and William.

e. A note in the original amount of $3,150.00, dated March 26, 1958, and signed by Ellen and William and by Dennis and Ina Griffin.

The findings disclose that until the middle of November, 1959, Ellen and William were in severe financial straits. They were continually delinquent in payments of both interest and principal on the above notes, and in tax payments on their home place. The request made to them by the defendant Bank at frequent intervals to pay the various delinquencies, clearly demonstrate that the Bank was aware of their precarious financial situation. William Griffin was in the logging business, apparently without much success, for the joint checking account used to pay the bills of such operations was overdrawn at frequent intervals.

In the fall of 1959, President Meaker and Director Brisbin of the Bank, visited the home of the petitioner. Mr. Meaker, in addition to being President and Director of the Bank, was an attorney, and his firm also acted as lawyers for the Bank. He had handled legal business for Ellen and William in the past, principally in preparing their income tax returns over the years. The purpose of the visit to the Griffin home at this time was to appraise its value and to warn the Griffins that under the conditions then existing it might be necessary for the Bank to institute foreclosure proceedings against the property.

Ellen advised the Bank officials at the time of this visit that she was soon to receive an inheritance of money and stocks and that as soon as she received this inheritance she would bring the delinquencies up to date as far as the loans on the home place were concerned. On November 25, 1959, Ellen received her inheritance which consisted of $5,111.52 in cash and stocks then having a market value of $20,000.

A listing of such stocks, given below, is necessary for an understanding of the questions presented on this appeal:

| No. of shares | Corporations |
|---|---|
| 11 | General Electric |
| 22 | General Portland Cement (1) |
| 8 | General Insurance (2) |
| 11 | Great Northern Railway |
| 7 | Gulf Oil Corporation |
| 55 | Metal and Thermit |
| 11 | Monmouth Racing Association |
| 71 | National Lead Co. Common Stock |
| 13 | Northern Pacific Railway (4) |
| 17 | Riegal Paper |
| 13 | Southern Company |
| 22 | United States Steel |
| 22 | U.S. Tobacco |
| 40 | Texas Company |

Two days after receiving her inheritance, Ellen made total payments to the Bank of interest and principal on the above mentioned notes of $684.24, and a short time later, paid in full a note dated December 16, 1958, with a then balance of $1,308.91, at the Bank's request.

It is from this point on, that is, from the time Ellen came into the possession of the money and stocks, that the Bank and the plaintiff entered into the transactions which are the subject of this controversy.

Involved here are five notes upon which Ellen's signature appears, given to the Bank between December 10, 1959 and April 29, 1960. Also involved are assignments to the Bank of the various stocks, listed above, signed by Ellen Griffin, ostensibly given as collateral security for the payment of some or all of the five notes. Plaintiff, in her complaint, asserts that she received no consideration for the notes given, and that by reason of the constructive fraud of the Bank, through its officers, she was induced to sign the various assignments of stock. The relief she seeks in her declaratory judgment action is a determination as to the actual ownership of the various stock certificates, as well as to her liability on the various notes.

Before proceeding to the decree of the chancellor relative to the right of ownership in the various stocks, and the liability of the petitioner on the respective notes, we must first resolve the questions initially presented to us in the brief of the Bank.

The Bank contends that the plaintiff, by her prayers, did not seek to have the chancellor determine the validity of any of the notes given by her to the Bank. But, as we said in *Blanchard* v. *Knights*, 121 Vt. 29, 36, 146 A. 2d 173:

> "The scope of a bill in equity is to be determined, not by the special prayers for particular relief, but by the case stated."

In the earlier case of *Hoadley* v. *Hoadley*, 114 Vt. 75, 79, 39 A. 2d 769, the Court stated:

> "Under the general prayer the plaintiff may have relief agreeable to the case made by the bill."

In her bill, the petitioner states that one of the questions she seeks to have determined is "as to the validity of certain of the notes and the validity of all the assignments . . ." Such questions were before the chancellor for his determination.

The Bank also advances the argument that both the validity of the note and of the various stock assignments was conceded by the petitioner in her pleadings, as well as by the introduction by the petitioner, in evidence of the notes and assignments involved. It is true that petitioner in her pleadings admitted signing the various notes, and the chancellor so found. It is also true that petitioner introduced into evidence the various assignments of stock and her signatures and stated she has made "a full and complete assignment" of her stock. But such pleadings and evidence were consistent with her further pleadings, and evidence, that such assignments were fraudulently obtained, and that certain of such notes were invalid.

It was essential for petitioner to plead existence and execution of the various notes and stock assignments, the validity of which she sought to have determined, as well as to introduce them into evidence. None of the cases cited to us by the defendant hold that such allegations in a pleading stops a plaintiff from asserting in the same pleading that such notes or assignments were invalid because of fraud or failure of consideration.

We cannot sustain defendant Bank's position that plaintiff had cast herself by her pleadings so that she was estopped from denying the validity of the notes and assignments in the hearing below on the grounds of constructive fraud and failure of consideration.

Nor can we sustain the Bank's brief that the plaintiff should not have been allowed to introduce evidence to vary the terms or legal effects on the written instruments introduced in this case. The case of

*Lunnie* v. *Gadapee,* 116 Vt. 261, 262-263, 73 A. 2d 312, cited to us by the defendant does state, as defendant says, that the parole evidence rule applies where the enforcement of an obligation created by the writing is substantially the cause of action. But the opinion goes on to hold that an exception to the parole evidence rule is applicable where the parties to the litigation and to the writing are the same, but the instrument, as here, is not the basis of the action.

Nor has the defendant, in its brief, pointed out that claimed errors in the admission of such evidence was ever brought to the attention of the chancellor in the hearing below. No question shall be brought to the Supreme Court except that upon which it is made to appear that the trial court has had fair opportunity to pass judgment. *Langevin* v. *Gilman,* 121 Vt. 440, 442, 159 A. 2d 340.

We now turn to the decree made below and the exceptions to it. Defendant Bank's exception to the decree raises only the question as to whether the decretal order is supported by the facts found. *Lorenz* v. *Rowley,* 122 Vt. 480, 486, 177 A. 2d 364.

What now concerns us is a series of five notes signed by the petitioner between December 10, 1959 and April 29, 1960, together with certain assignments covering all the stock of the plaintiff, and which defendant Bank claims to be security for payment of these notes. The total amount of such notes exceeds $22,000.00.

The chancellor found that such notes and assignments of stock were signed by the petitioner under the following set of circumstances. They were signed by her either while in the hospital following an automobile accident in which she and her three children suffered personal injuries, or soon after leaving the hospital. The plaintiff received none of the proceeds from such loans, except for certain deposits made in the joint checking account used by defendant William Griffin in his business. The loans were never passed upon by the Directors of the Waterbury Bank until after they were made.

In view of the plaintiff's claims of constructive fraud on the part of the Bank through its officers, the findings as to the relationship between the President of the Bank, Mr. Meaker, and Ellen Griffin, the plaintiff, are important. Mr. Meaker, in his capacity as an attorney, had acted as lawyer for both the plaintiff and her husband, principally in making out their income tax returns for a period of several years. However, the chancellor also found that Mr. Meaker had acted as attorney for the plaintiff in connection with legal matters concerning her automobile accident in November, 1959. Also, found by the chan-

cellor was that at no time during these tranactions was the plaintiff ever advised of her legal rights or effects of these transactions by the Bank officials.

The first of such notes signed by the plaintiff was on December 10, 1959, while she was still in the hospital following her accident. It was in the amount of $2,500.00. At the time of such signing, language appeared on the face of the note concerning the assignment of 40 shares of Texaco, Inc. stock "as additional security for payment of this note." At the same time, plaintiff signed an assignment of the Texaco shares to the Bank, and while such assignment is witnessed by Mr. Chase, Treasurer of the Bank, neither Chase, nor any other Bank official was present at the time of such signing.

Sometime after the signing of the note, the Bank caused to be added to the stocks listed as collateral security on such note 14 shares of Gulf Oil Corporation, 41 shares of American Can Company (such stock had been received in place of the Metal and Thermit shares) and 40 shares of Texaco Company, which Texaco shares had been received in a one for one stock split from the Texaco corporation after the making of the note and the assignment of the stock to the Bank by the plaintiff.

The second note in this series was signed on December 28, 1959, by the plaintiff, in the amount of $4,000.00 and contained on the face of the note, at the time it was signed, a statement that 11 shares of National Lead Company stock had been assigned to the Bank as collateral security for its payment. A general assignment of such shares of stock to the Bank was signed by the plaintiff on the same date. At a point later in time, and without the knowledge or consent of the plaintiff, the Bank caused to be added as collateral security described on such note "also Gulf Oil Certificate No. G025131 exchanged 8/29/63 for 41 shares of American Can Company, common." The Bank admitted that changes as to the collateral security in both notes were made following the signing of the note by the plaintiff and without her knowledge. The finding is that no assignment had been made to the Bank at the time the note was signed of the stocks later added to it. The chancellor found that both of these notes were altered by the Bank in adding to the list of stocks assigned as collateral security on each.

The decretal order relative to these two notes is that the Bank is entitled to hold only the Texaco stock and the National Lead Company stock for the payments of these two notes, with any sums left after such notes are satisfied being paid over to the plaintiff.

Defendant Bank claims that the addition of the stocks to the notes after the date of signing was only a "bookkeeping" matter and was not a material alteration.

9 V.S.A § 576 of the Negotiable Instruments Act provides:

"Where a negotiable instrument is materially altered without the assent of all parties liable thereon, it is avoided, except as against a party who has himself made, authorized or assented to the alteration, and subsequent indorsers; but when an instrument has been materially altered and is in the hands of a holder in due course, not a party to the alteration, he may enforce payment thereof according to its original tenor."

9 V.S.A § 577 provided in part:

*"What constitutes a material alteration:*

An alteration is material which changes:

... or (6) which adds a place of payment where a place of payment is not specified, or any other change or addition which alters the effect of the instrument in any respect."

The findings establish that the Bank, not a holder in due course of the note, added certain stocks to the memoranda on the notes setting forth the collateral security by which notes were secured, after their respective executions, and without the assent or knowledge of the party liable thereon.

The test laid down to determine which alterations are material and which are not, is set forth in *Gray* v. *Williams et al,* 91 Vt. 111, 117, 99 Atl. 735:

"A material alteration is one which makes the instrument speak a different language in legal effect from what it originally spoke; an alteration which produces some change in the right, interests and obligations of the parties to the instrument."

Also pertinent to the notes we are now considering is the following quotation from the same case:

"The general rule is that if a memorandum written on an instrument in the margin or at the foot is made before or at the time of its execution, it is considered a part of it; and if it affects the operation of the terms of the body of the instrument, it is a material part of it." *Gray* v. *Williams,* supra, p. 119.

■ We have no hesitancy in holding that the two notes now under discussion were materially altered. Such alteration materially affected the interest of the plaintiff in that certain of her securities, not pledged

for the payment of the notes at the time she executed them, were made subject to such liability because of the unauthorized alteration. Such changes materially altered the effect of the instrument upon the plaintiff and her property.

However, that part of the decretal order which states that the plaintiff is liable to the Bank on the two notes which were materially altered, and that the Bank is entitled to use the proceeds of, the Texaco and National Lead Co. stock, is inconsistent with a material alteration of such notes.

A material alteration in the note by the Bank, a party to it, was destructive of its validity. *Barton Savings Bank and Trust Co.* v. *Stephenson,* 87 Vt. 433, pgs. 438-439, 89 Atl. 639. It necessarily follows that the decree, in accordance with the findings, should have declared the plaintiff not liable on such notes by reason of such material alteration, and the assignments of stock, if only given to secure such notes, would also become invalid.

On March 7, 1960, the plaintiff and defendant husband signed a discount note in the principal sum of $11,705.52, payable in installments and secured by 1 International TD-14 Crawler Tractor, at the Waterbury Bank. No other collateral security is set forth in the note. At the same time and place, the plaintiff signed general assignments to the Bank of the following shares of stock:

11 shares of General Electric Co.
22 shares of General Portland Cement Co.
21 shares of Gulf Oil Corporation
55 shares of Metal and Thermit Corporation
17 shares of Riegal Paper Corporation
13 shares of Northern Pacific
22 shares of U.S. Tobacco Company
22 shares of United Steel Corporation
13 shares of Southern Company.

The Crawler Tractor, stated on the note to be collateral security for the loan, was, on March 7th, the date of the loan, under a mortgage to the State Equipment Co. This mortgage was paid off by the proceeds received from the loan, and the Bank then took a first mortgage on this equipment. The Bank, according to its appraiser's report, valued this equipment at between $15,000 and $18,000. Such appraiser's report also states: "add'l security various certificates of stocks (see c/o Ellen Griffin) present value $6,000.00." It was the finding of the chancellor that the loan of $11,705.52, by reason of the mortgage on the equipment

and the stock assignments, was secured in an amount not less than $25,000 or more than $28,000.

Also found was that the plaintiff believed that such stock assignment was for the temporary purpose of securing the Bank on such loan, only until the indebtedness to the State Equipment Co. on the Crawler Tractor had been paid, and the Bank was secured on its loan by a mortgage on such equipment. No explanation of the effect of the stock assignment was made by any Bank official to the plaintiff, although none was requested by her, and the assignments were drawn out of her presence, and then presented to her for her signature. None of the proceeds of the note was received by the plaintiff.

The decretal order directs that all of the securities listed above, assigned by the plaintiff to the Bank, be returned to the plaintiff, which is excepted to by the defendant Bank.

This brings us to principal contention in the cause before us. It is the position of the defendant Bank that all assignments of stock made to it by the plaintiff, secured all the notes signed by her, such assignments being unequivocal and with no conditions attached. The facts found by the chancellor, asserts the Bank, do not establish fraud on the part of the Bank, and so the decretal order returning the assigned stocks to the plaintiff cannot be sustained.

The chancellor finds that the Bank obtained such stock assignments by virtue of its confidential relationship with the plaintiff, and by reason of a failure on the Bank's part to fully inform and advise the plaintiff of the nature, extent and effect of such assignments. Also found is that the Bank had superior knowledge on the contracts, which was not available to the plaintiff. The chancellor found a confidential relationship between Bank and plaintiff existed through its President, Mr. Meaker, who was also attorney for the plaintiff and her husband, not only on tax matters, but for the plaintiff on matters relating to her automobile accident. Further, found by the chancellor was that the defendant Bank was adquately secured on the tractor loan of March 7, 1960, without the general assignments of most of her stock made by the plaintiff at that time.

On March 7, 1960, the plaintiff and the defendant husband signed a discount note in the principal sum of $11,705.52. Upon the face of the note appears "This note secured by Chattel 1 International TD-14 Crawler Tractor." No other collateral security is set forth on said note.

While at the Bank, and at the same time, the plaintiff was requested

to wait until certain assignments of stock were prepared for her signature. Such assignments were in general form, entitled "Assignment Separate From Certificate", and assigned to the Bank of Waterbury the number and kind of stock certificates listed above.

It is the Bank's position that, as its brief states, "the stocks taken in on March 7, 1960 were considered by the Bank to be additional security for the loan of that date." The brief also goes on to state: "As far as the Bank was concerned, all certificates secured all notes." This is because, as the Bank asserts, the written assignments and designations of attorney for transfer of the stock are all unequivocal and with no conditions attached. Admitted by the Bank is that no discussion was held between the plaintiff and the Bank and its officials, regarding any terms or conditions under which the assignments were made. By virtue of the assignments described above (and the Bank's unilateral understanding of their legal significance), the Bank contends that all indebtedness due it from the plaintiff is secured by such assignments.

The plaintiff's position in the matter is set forth in No. 13 of the findings of fact: "That the Chancellor finds that the Petitioner believed when she went to the Bank in connection with this transaction relating to the purchase of International TD-14 Tractor by Defendant husband, that the assignment of her shares of stock as above set forth on March 7, 1960, was a temporary arrangement to enable the Bank to take title to the tractor, dozer and winch, which equipment was then under a mortgage to the State Equipment Company; that the Petitioner believed she was in no way liable for the payments of the indebtedness in connection with the tractor, dozer and winch to the State Equipment Company, and that petitioner did not receive any of the proceeds of the note of March 7, 1960. . . . ."

This finding, like all others, is not excepted to by the Bank by brief here. But if it were we think it would be amply supported, not only by the testimony of the plaintiff but by the circumstances surrounding the assignments. The note had only the equipment listed as collateral upon its face. Further, the value of the equipment, once in the Bank's possession, had an admitted value of between $15,000 and $18,000, a sum greater than the face of the note. Added to this is the conceded lack of any other explanation of such assignments on the part of the Bank to the plaintiff.

The decretal order directs that all of the securities listed above, assigned by the plaintiff to the Bank, be returned to the plaintiff. It is apparent that the Chancellor made such order on the ground that there was constructive fraud on the part of the Bank in its dealings

with the plaintiff. The Bank asserts that the Chancellor made no findings upon which a composite finding of constructive fraud on the part of the Bank could be made.

No. 23 of the findings of facts states: "That the Chancellor finds that the Petitioner at the time she signed the note for $11,705.52 (Plaintiff's exhibit 3) was not fully and fairly informed by Defendant Bank as to the full nature, extent and legal effect of such transaction; that the Bank had superior knowledge as a party to the contract, or knowledge which was not within the fair and reasonable reach of the Petitioner and which she could not discover by the exercise of reasonable diligence; that the Bank stood in a close confidential relationship through its President, Mr. Meaker, who was also attorney for Defendant Griffin and the Chancellor further finds that in fact had acted as attorney for the Petitioner in connection with legal matters concerning her automobile accident as late as November, 1959; that the defendant Bank had adequate security for the so-called tractor loan (Plaintiff's exhibit 3) by reason of its then value without the Petitioner assigning her shares of stock represented by Plaintiff's exhibits 12 through 18." The last exhibits referred to are the stock assignments here in dispute.

"Even where there is no actual fraud courts of equity will frequently relieve against hard and unconscionable contracts which have been procured by taking advantage of the condition, circumstances or necessities of the other party, especially if such contracts are made by parties acting in a fiduciary capacity." 23 Am. Jur. Fraud and Deceit, § 16, p. 767.

The findings disclose that the Bank loaned thousands of dollars to defendant Griffin and the Petitioner during a period when the Bank was well aware of the desperate financial straits of defendant Griffin. At least, in part, such knowledge had been obtained by the Bank President, in his fiduciary relationship with the Griffins as their attorney, in making out their income tax returns. In the year 1959, for example, the tax return prepared by the Bank official showed that defendant Griffin had a profit from his logging business of only $949.32--hardly sufficient to meet the obligation to the Bank then existing.

There can be little doubt that the Bank was well aware that a general assignment of all her stocks by the plaintiff to the Bank to secure all the indebtedness of the plaintiff and her husband to the Bank would be of great benefit to it. At the time of the transactions of March 7th, leading to the stock assignments, by virtue of its close and confidential relationship with the plaintiff through the fiduciary relationship of its President, the Bank knew that the resources and

income of the defendant husband and the plaintiff wife were inadequate to return to the Bank the money already advanced to them unless the stocks then in the ownership and possession of the plaintiff were made general collateral for all loans.

The loan actually made on March 7th, and for which the note was signed by the plaintiff, as we have already seen, was amply secured by the equipment stated to be the collateral security on the note. As the chancellor found, and as we have commented, none of the circumstances of the signing of the note and assignments relative to the signing of the note on March 7th by this plaintiff (with the exception of the legal form of the assignments) served to notify the plaintiff that the assignments of stocks then made by her were to be used by the Bank as collateral for all her indebtedness to the Bank, past, present and future.

There is no disagreement here that the Bank, at no time, ever offered to the plaintiff any explanation of the situation in which she would place herself by the signing of the general assignments of stock. The constructive fraud found by the chancellor in No. 23 of the findings is that there was a duty upon the Bank, because of the relationship of the parties, to disclose to the plaintiff the liabilities she would assume on her signing of the stock assignments.

As stated in *Howard* v. *Howard*, 122 Vt. 27, 32, 163 A2d 861: "Fraud in equity reaches an intentional act and concealment involving a breach of duty or confidence, by which undue or unconscientious advantage is obtained."

The distinction between active and passive concealment in cases of fraud was well pointed out in the earlier case of *Newell Brothers* v. *Hanson*, 97 Vt. 297, pp. 303-304, 123 Atl. 208:

"The law distinguishes between what is termed active fraud and passive concealment. Mere silence, or mere failure to disclose known fact, though material, may not be fraudulent. Where persons are dealing at 'arms length' as where the facts are equally within the knowledge of both, neither is required to speak, in the absence of inquiry respecting such matters. But fraud may be committed by the suppression of truth as well as by the suggestion of falsehood. The test of liability for failure to disclose facts material to the transaction is some duty, legal or equitable, arising from the relations of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge. When in the circumstances of the particular case such duty is present, failure to disclose a material

fact with intention to mislead or defraud is equivalent to a fraudulent concealment of the fact and stands no better than the affirmation of material misrepresentation."

In these security transactions the plaintiff and the defendant were not dealing at arm's length. The defendant's President obviously gained the plaintiff's confidence by virtue of his engagement as her attorney in other matters. While there was no breach of fidelity arising from that representation, its very existence creates a fiduciary tie not present in the usual bargaining position between borrower and lender.

The findings contain no implication that Meaker entertained any conscious purpose to take advantage of the plaintiff. Nonetheless, when the defendant Bank elected to deal with the plaintiff frequently through its president, who had previously served the plaintiff as a confidential advisor, it became charged with something stricter than the "morals of the marketplace." In this situation, secret, silent and undisclosed objectives will not satisfy the demands of equity and fair dealing. *Minehard v. Salmon,* 249 N.Y. 458, 164 N.E. 545, 546.

It is clear from the record presented that the defendant's acquisition of the assignment on March 7, 1960 was the combined product of the plaintiff's misunderstanding on the one hand, and the superior advantage of the defendant on the other. Through its silence and the misleading description of the security designated to secure the obligation, the defendant contributed to the misunderstanding.

These considerations support the intervention of equity by way of a decree that the plaintiff be restored to possession of the stock certificates now held by the defendant.

*The decree below is affirmed as to No. 1. It is amended as to No. 2. in that the stocks there set forth shall be returned to the plaintiff, and the notes herein described are declared void. It is affirmed as to the remainder of the decree, to which no exceptions have been briefed.*

## On Reargument

Present: **Holden, C. J., Shangraw, Barney and Keyser, JJ.**

**Holden, C. J.** After the opinion in this case was filed at the October Term 1965 the defendant Bank of Waterbury in due time requested reargument. Reargument was ordered and heard at the February Term 1966.

At the rehearing the defendant undertook to challenge twelve findings of fact made by the chancellor on the ground that the facts stated in these findings are not supported by the evidence. None of the deficiencies now claimed as to the findings were briefed when the appeal was first presented.

The office of reargument is to present to the Court some point overlooked, whether of law or fact, which was presented in the brief upon the original argument of the case. New questions are not for consideration nor are issues that have been argued and decided upon due consideration of the pertinent law and facts. *Goodwin Admx.* v. *Gaston,* 103 Vt. 357, 367, 154 Atl. 772; Supreme Court Rule 22.

The defendant refers us to numerous exceptions to the findings filed in the court of chancery. Since none of these exceptions was briefed the findings stand unchallenged on appeal. This effect is not changed by 12 V.S.A. §2385, enacted in 1959, which eliminates the necessity for filing exceptions to findings of fact as a prerequisite to preserve the question on appeal. But the requirements as to briefing remain unchanged. By force of this statute the appellant's brief takes on new importance in connection with findings of fact". . . since it now has the office of first raising the objection and then demonstrating that it is well founded." *Bresette* v. *Knapp,* 121 Vt. 376, 378, 159 A.2d 329; *Neverett* v. *Towne,* 123 Vt. 45, 179 A.2d 583; *Davis* v. *Kneeland Lumber Co.,* 124 Vt. 70, 71, 196 A.2d 572.

When the cause was first argued the bank took the position that its president, Mr. Meaker, was acting solely for the bank and not in an attorney-client relationship with the plaintiff. In the initial brief it was called to our attention that there was no evidence that Mr. Meaker was called upon to act as her attorney, or to advise her as such, with respect to the execution of the notes or the assignment of stocks. "As a matter of fact the evidence discloses that, prior to their assignment, her stock certificates were in the hands of Mr. Joslin, who was then acting as her attorney representing her in this action." (Def. Br. 13). The fact that the plaintiff had other counsel available for consultation during some of the transactions here in question, was not mentioned in the opinion. The bank's request for permission to reargue was predicted upon the position that the nature of the relationship between the plaintiff and Mr. Meaker was misunderstood. The bank further contended there was a total absence of any evidence to support the conclusion that the plaintiff reposed any confidence whatsoever in Mr. Meaker throughout these transactions. Since this was a controlling factor in allowing reargument, we go straight to this

point. In so doing, our search has taken us behind the findings to the evidence received at the trial.

As the main opinion points out, until the middle of November 1959 the plaintiff and her husband were in severe financial difficulty. Their joint obligations to the bank on five different notes were continuously delinquent in payments of both interest and principal. Taxes on their homeplace were in arrears. The bank repeatedly requested the Griffins to pay various delinquencies. It is manifest from the findings and the record the bank became increasingly aware of their financial stress. The plaintiff's husband was in the logging business and his checking account with the plaintiff, used to pay business obligations, was frequently overdrawn. During the period from August to November, 1959, the bank statement of this account showed more overdrafts than other entries. The bank examiners became increasingly critical of the Griffin loans and requested the bank to obtain a current financial statement of the Griffin logging enterprise. It was in this background that Mr. Meaker, as the defendant's president, and Mr. Brisbin, one of the defendant's directors, called on the plaintiff in the fall of 1959. The object of their visit was the bank's concern over the note of $7,200, dated November 2, 1956, secured by a government guaranteed mortgage on the Griffin home. It was their purpose to examine the premises for purposes of reappraising its value. During the course of this visit they informed Mrs. Griffin that unless the obligation was made current, foreclosure proceedings would be instituted.

To this the plaintiff responded by informing Mr. Meaker and Mr. Brisbin that she was about to inherit money and stocks and that when she received these funds she would take care of the arrearage insofar as the home property was concerned. She visited with the bank officers about her securities and inquired whether it would be best to borrow or sell stocks to satisfy this obligation. The defendant's president, Mr. Meaker, declined to advise her in this regard but suggested she should seek advice from someone in the stock business. The plaintiff assured them she would take care of the home loan.

Shortly after this conference the plaintiff received her inheritance. Two days later, on November 16, 1959, the plaintiff went to the bank and paid the amount past due on the delinquent home mortgage. In addition, the bank requested and received $698.70 to apply on all loans except the note of $1,485.53 dated December 15, 1958. The bank requested this particular obligation be paid in full. The plaintiff complied.

Shortly after these transactions the plaintiff and her children

became involved in an automobile accident and all were hospitalized. The chancellor found that during the next five months the plaintiff was induced to sign a series of new notes aggregating $22,000, which increased the original indebtedness from $11,000 to $33,000. Although none of the proceeds from these loans were received by the plaintiff, most of her inheritance was transferred to the defendant to secure these obligations.

The bank's participation in this result is the crux of this controversy. Its part in these transactions is complicated by the fact that its president and counsel had previously served as attorney for the Griffins in the preparation of income tax returns. Mr. Meaker testified that the plaintiff and her husband had consulted him in his office in connection with the automobile accident of 1959.

There is no claim of violation of professional confidence or breach of professional ethics. However, the question of the plaintiff's reliance on the bank and its officers, without the need for independent legal advice, must be considered in the light of the past relationships. Mr. Meaker's prior representation of the plaintiff and her husband is also of significance in its bearing on his knowledge, as an officer of the bank, of the financial distress and the family circumstances which attended these transactions. As a result of assisting the plaintiff and her husband in the preparation of income tax returns for 1959, the president of the bank knew, or should have known, that the interest on past obligations, before the assignment of the plaintiff's stock, was more than twice the amount received by the plaintiff and her husband as earnings for that year.

That the bank was keenly interested in obtaining additional security for the overdue obligations from the plaintiff is manifest from the record. Its treasurer, Mr. Chase, testified "We had been promised for a long period of time that the delinquencies would be taken care of from the inheritance." It appears from the testimony of the treasurer that he urged the plaintiff's husband in this direction.

It is of some significance, too, that the plaintiff's pledge of substantially all her inheritance went far beyond her commitment made to the bank officers at the time of the threatened foreclosure. On that occasion she promised to take care of the mortgage on their homeplace. Her payment of $2,000 in November, 1959, exceeded this assurance but there was no indication from the bank or any of its officials that they would look to the plaintiff to secure future business obligations which might be incurred by her husband to an extent that tripled the past indebtedness.

That the plaintiff relied on the integrity and fair dealing of those representing the bank is demonstrated in the record. She solicited advice of the bank officials as to how she could take care of the government insured mortgage to the bank, whether by loan or pledge. She left the key to her safety deposit box in the custody of the bank's treasurer. She signed the instruments presented to her by officials of the bank without question.

The record bears out the bank's contention that the securities, before assignment, were in the custody of Mr. Joslin. From his cross-examination of the bank's president, it appears that Mr. Joslin was handling the estate from which the plaintiff's inheritance was derived. In any event, it does not appear that the plaintiff called upon any attorney for advice before making the assignments in question. Neither is there any indication that she had reason to suspect bad faith or undue advantage on the part of the bank at this time. There is nothing to indicate that she felt it necessary to seek independent advice in connection with the transactions which are the subject of this controversy.

The bank's desire to apply the resources gained from the plaintiff's assignment of her inheritance appears from testimony of its treasurer, Mr. Chase. This purpose resulted in the alteration of the notes given December 10 and December 28, 1959. The excess of security gained in the transaction on the tractor loan on March 7, was applied at will to prior obligations as the treasurer thought expedient for the bank. These writings were material since they purported to increase the security which the plaintiff had committed to these notes, directly affecting the rights of both parties.

The stock certificates assigned in blank on March 7 were accepted by the bank at a time when the prospect that past obligations would be honored was hopeless. Two days after this assignment, on March 9, the bank's treasurer wrote to the plaintiff's husband reminding him of an overdraft on the checking account. The communication called to his attention that the "G.I. Loan" on the homeplace was delinquent and requested immediate satisfaction of these obligations "otherwise, we must make up a small note for this amount secured by the stock we are now holding belonging to your wife. . . ."

Later, on June 30, the bank's president wrote to Mr. and Mrs. Griffin "You must be advised at this time unless some definite arrangement is made, our next step will be to sell the securities which are here as collateral, take possession of your personal property equip-

ment and have a sheriff's sale of that and, if necessary, proceed with foreclosure of your home."

In retrospect, the plaintiff's first intimation to the bank of her prospective inheritance, as a means to take care of the mortgage on her home, became the signal for vastly increased new obligations. Those representing the bank knew, or should have known, that repayment was beyond all financial capability of the obligors to repay except by resort to the plaintiff's inheritance. And the new loans became the vehicle by which the bank obtained possession of the plaintiff's inheritance.

It cannot be questioned that the defendant, William Griffin, participated in the inducement of the plaintiff to enter these transactions. We recognize that the most dominant influence of all relations is that of the husband over the wife. Transactions between them to be valid, particularly as to her, must be fair and reasonable, voluntarily and understandably made. Such transactions are jealously scrutinized to prevent the wife from being overreached or defrauded by undue influence or improper conduct on the part of her husband. When they are brought about by anything amounting to constructive fraud on his part, they are voidable against all persons participating other than bona fide purchasers. *Peyton* v. *William Peyton Corp.*, 23 Del. Ch. 321 7A.2d 737; 123 A.L.R. 1482 and annotation which follows; 26 Am. Jur. Husband and Wife, §269; 41 C.J.S. §514. See also, *Commercial Credit Plan, Inc.* v. *Beebe*, 123 Vt. 317, 321, 187 A.2d 502.

While the bank refrained from any direct persuasion or inducement, the evidence establishes that its treasurer urged the codefendant husband to gain access to his wife's inheritance. Mr. Chase testified he had conversations with the plaintiff's husband, inquiring when his wife was going to get the money and make some payments to the bank.

As a result of these activities the bank moved from the status of a creditor, with meager and scant security for delinquent obligations of $11,000, to the comfortable position of abundant protection on combined obligations in excess of $35,000. All of this was at the expence of the plaintiff's newly acquired inheritance.

Perhaps no single circumstance, standing alone, would justify the interference of equity. In combination they present the necessary ingredients for equitable relief.

Unfairness and undue advantage to the point of constructive fraud, may be derived from a variety of circumstances. Ordinarily it is enough

to justify the intervention of equity if a "vendee has actively attempted to ensnare, and has in fact ensnared, the vendor into the making of an unconscionable contract." *Crompton* v. *Beedle and Thomas*, 83 Vt. 287, 297, 75 Atl. 331; *Howard* v. *Howard*, 122 Vt. 27, 32, 163 A.2d 861.

Equity jurisdiction extends to "those cases where a party, although perhaps still keeping within the limits of the strict law, so as to be sustained by the law courts, had committed some unconscientious act or breach of good faith, and had thereby obtained an undue advantage over another, which advantage, even though legal, equity would not suffer him to retain." 3 Pomeroy's Equity Jurisprudence, §873 (Fifth Edition).

██ The term "fraud" as applied to the bank's participation and that of its officers, is to be understood in its innocent sense without involvement of evil intent. *In re Campbell's Will*, 100 Vt. 395, 402, 138 Atl. 725. Nonetheless, the findings and the record support the inference that the undue advantage acquired through the transactions which started in November 1959, was intentionally gained for the purpose of salvaging distressed obligations at the plaintiff's expense. See *Kendall's Admr.* v. *Roseberry*, 120 Vt. 498, 502, 144 A.2d 836. And the bank knew, or should have known, that the plaintiff personally was to receive none of the proceeds of the new loans.

It is not disputed that the assignment of March 7, 1960, was negotiated when the plaintiff was acting under the misapprehension and misunderstanding that the pledge of her stock was to be temporary and only during refinancing of the tractor. The bank said or did nothing to dispel this illusion; it remained silent. "As far as the bank was concerned, all certificates secured all notes." Beyond that the bank presented for the plaintiff's signature a note which made no mention of her stocks and bonds as security. The security, designated on the note, mentioned only the chattel, and this security the bank had left undisturbed. Certainly the bank was aware of its own intentions. The bank knew, or should have known, that if this pledge was to be taken as a blanket assignment, the plaintiff's inheritance would be irretrievably consumed to satisfy obligations which yielded her no consideration.

██ In the light of the plaintiff's predicament and her past association with the bank and its officers, there was a duty on the bank to disclose its intention and the impending consequences to the plaintiff. Considerations of candor and fairness required at least that. In these circumstances the suppression of important facts calculated to mislead

will vitiate the assignment. *Brigham* v. *Dana,* (Redfield, C.J.) 29Vt. 1, 11.

The decree of the chancellor, which restores the plaintiff to possession of the securities thus parted with, is well founded on fundamental considerations of equity.

The other points raised in reargument are fully disposed of in the first opinion.

*Let full entry go down.*

**Shangraw, J.** Dissenting. I cannot ignore the contractual aspects of this case. It is my view that the controlling issue is limited to the following. For what purpose did plaintiff make the general stock assignments on March 7, 1960? Were these assignments then made to secure payment of the one note of $11,705.52 bearing the same date, as plaintiff understood the facts to be, or on the contrary did they secure the payment of past, present, and future obligations as claimed by the bank? Upon this basis I would remand for a further hearing if necessary, and a finding on this one issue, which is the crux of the controversy and would determine its result. This is the axis on which this case should be decided.

It is also my view that the bank president's prior representation of plaintiff in matters entirely unrelated to her transactions with the bank, particularly the stock assignments, is of no significance, and should not be reflected in the opinion or its result.

In my judgment, considering all factors, and the apparent desire on the part of the plaintiff to assist her husband in his business dealings with the bank, that the determination of unfairness on the part of the bank officials is, I believe, unnecessary and unwarranted. The assignment of stocks was an over-the-counter transaction. Plaintiff neither sought or obtained the advice of any of the officers of the bank concerning this transaction.

The effect of the majority opinion, and the grounds upon which final determination is based, presents far reaching implications incident to an attorney-banker relationship, and also leaves in a grey area to what extent bank officers are required to furnish unsolicited advice, with possible legal implications, to customers with whom they may deal.

I agree that the notes of $2,500 and $4,000, referred to in the opinion, have been materially altered within the concept of our Negotiable Instrument Act.