248 P.2d 683

**CURTIS v. CURTIS.**

No. 5446.

Supreme Court of New Mexico.

Sept. 4, 1952.

Rehearing Denied Oct. 20, 1952.

Grantham, Bratton & Spann, Albuquerque, for appellant.

Royall & Royall, Silver City, for appellee.

COORS, Justice.

The plaintiff instituted an action against the defendant for divorce and division of community property. The defendant answered and cross-complained, denying the existence of community property and setting up an agreement between the parties purportedly entered into as a separation agreement with division of the property, executed in 1936. The defendant also set up an affidavit executed by the plaintiff in 1941 confirming and ratifying the earlier agreement. The plaintiff argued that both of these instruments were executed because of the fraud of the defendant. The trial court gave judgment for the plaintiff.

On appeal the defendant raises the following points: (1) That the separation agreement with division of property between the parties was in all respects a valid agreement containing a disclosure of the description and extent of their community property and awarding to the plaintiff a fair division of the property and that she had independent legal advice. (2) That even if the original agreement might be held to be voidable, it was subsequently ratified by plaintiff. (3) That the attempt by plaintiff to set aside the separation agreement with division of property is barred by the statute of limitations or laches. (4) That there was no substantial evidence to support the findings and judgment of the court as to the value of the property of the parties at the time of trial, and that such findings and judgment are against the weight of the evidence.

The parties were married in Oklahoma in 1913 and four children were born to them, all of whom were of age at the time of this trial. After living in Arkansas and Oklahoma, the parties moved to New Mexico in 1919, and in 1921 settled in Ca-

tron County and homesteaded. The defendant worked for his brother part of each year, haying and doing odd jobs, and during the summer months he sold automobile accessories. In 1927 he and his wife bought an abandoned building in Quemado, New Mexico, and opened a general store. The plaintiff assisted her husband in the operation of the store while he attended to the business details and necessary purchasing. In addition, he spent some time freighting and hauling gas and merchandise for others. In 1930 the parties added to the store an auto camp, gaining additional revenue from the rental of cabins. In 1932 the defendant gave up his freighting business and secured a saline lease from the Commissioner of Public Lands of New Mexico on a salt lake near Quemado for purposes of obtaining, processing and selling salt.

So the parties continued until 1936, when an instrument was drawn entitled "Separation Agreement with Division of Property." This agreement recited certain unhappy differences had arisen between the parties and they were living separate from each other and it was their desire to settle and determine their property rights. The substance of the agreement provided the wife was to receive the store formerly operated by the parties, the auto camp and the fixtures and appurtenances to said property, the stock of goods, the good will of the business, the household furniture and all outstanding accounts due to the parties from the operation of the store; all notes and mortgages; a half section of land; a ford car; one-third of amount received upon contemplated sale of certain cattle and $3,290.20 in cash. The defendant was to receive the property known as the "Lake Property" located at Salt Lake, New Mexico, including the lease therefor and all improvements thereon for the harvesting and storage of salt, the salt on hand and buildings and equipment; two-thirds of the proceeds from said sale of cattle; seven lots in Quemado; a half section of land and $3,290.20 in cash. The agreement further stated the property, as divided, was to be the sole and separate property of each, free from any claim thereto by the other party. Finally the plaintiff agreed to release all claims and demands of any nature, support, alimony, etc., thereafter arising by virtue of the marriage relation.

The testimony concerning the circumstances surrounding the execution of this agreement is in conflict. The wife testified in substance as follows: Her husband took her to Albuquerque in June, 1936, intending, he led her to believe, to effect a division of their property for income tax purposes. He had previously had her write to an attorney there, Mr. Joseph Gill, now deceased, stating she wished a division of the property. Upon that visit to Albuquerque they went to Mr. Gill's office where the husband told Mr. Gill the purpose of

their visit. Thereafter the attorney and the defendant conferred in another room for about an hour and a half. The parties then left the office and returned to Quemado. On August 28, 1936, the defendant again brought the plaintiff to Mr. Gill's office in Albuquerque where the defendant stated they had come to sign the papers. The plaintiff then signed the agreement without reading it and did not receive a copy of it. No discussion was had as to the value of the property and the extent of her rights and interest in it. Throughout the entire transaction and for years following she believed the agreement was made solely for the purpose of reducing their income tax.

The defendant contradicted the testimony of the plaintiff regarding these circumstances in almost every particular.

The trial court found the plaintiff did not have at that time independent legal advice, or receive a full and fair disclosure of the extent and value of the community property and her rights therein; that she did not receive adequate consideration for the signing of said agreement and did not read the agreement or know it was intended to be a separation agreement with division of property; and that such agreement was procured by fraud on the part of the defendant.

After the agreement was executed the parties returned to Quemado, the plaintiff testifying they continued to live as before with the defendant spending part of his time in Quemado and part at Salt Lake. She further stated their affairs were conducted as before and that she attended to the daily operation of the store and cabins, while the defendant handled all the business transactions of the parties. Her testimony in this regard is corroborated in part by two other witnesses, daughters of the parties. The plaintiff further testified she did not learn until 1938 that the store property had been deeded to her. At that time the defendant recorded the property division agreement and gave her a copy of it. When she questioned him about it, he again led her to believe he had had it made and recorded solely to reduce their income tax. Other pertinent testimony of the plaintiff is as follows: The defendant handled all the bank deposits, even for accounts in the name of the plaintiff, and wrote out the checks. After writing out several he would bring them to the plaintiff to sign and she would sign them without determining to whom they were going and for what. She relied on the defendant to manage their affairs and remained uninformed about the property and the conduct of their business.

The defendant testified he bought a bed and moved it and some of his personal belongings out to Salt Lake immediately after the execution of the separation agreement. But it is undisputed that he did re-

turn in a few weeks and the parties continued to live together as husband and wife until about a year prior to the institution of this action. However, their relationship was not harmonious and several divorce actions were filed and dismissed by each of the parties.

The plaintiff testified it was not until the first of the divorce actions was filed, in 1940, that she realized the defendant intended to use the separation agreement as a permanent division of their property. Thereupon she secured an attorney and filed of record an affidavit repudiating the separation agreement. A few months later she executed and filed a second affidavit, the purport of which was to withdraw the notice previously filed and fully ratify and confirm the property settlement of 1936. The plaintiff testified the defendant promised if she would execute this affidavit confirming the earlier agreement he would continue their marriage and care for and support her, leaving her well provided for in the event of his death. She asserted the defendant never had any intention of performing his promises and that in reliance upon them she executed the affidavit. The trial court found in favor of the plaintiff that the defendant obtained the affidavit by such false and fraudulent representations.

In cases involving an allegation of fraud on the part of one standing in a confidential relation to the one asserting the fraud, the courts frequently, if not generally, have no direct evidence as to the fraud except the assertion of it by one and the denial of it by the other. Of necessity the courts must look to the surrounding circumstances for corroboration of the statements of the parties. Trigg v. Trigg, 1933, 37 N.M. 296, 22 P.2d 119; Cardenas v. Ortiz, 1924, 29 N.M. 633, 226 P. 418. In the present case the attorney who prepared the separation agreement and property division was deceased at the time of the trial and no other witness was produced regarding the transaction. It is true the wife wrote to the attorney in the first instance, but she testified she did so at the insistence of her husband. Such fact is not improbable. Throughout the entire record the defendant is clearly the dominant spouse—both before and after the execution of the agreement, while the wife in subservience to him, and in attempts to mollify his rages, would agree to anything he demanded. Furthermore some of the acts of the defendant seem a little over-cautious and careful in trying to cover his tracks and expose those of his wife. We refer to his careful preservation of any matter which would tend to cast the plaintiff in a bad light, including carbon copies of his letters to her and her responses; any papers he could find about the store which might be helpful to him at a later time, and the check in payment of attorney's fees for the services of Joseph

Gill. This check bore the following endorsement by the defendant: "Paying statement of June 10 & June 30th 1936 in accordance with provisions in letter of July 8th, 1936, relative to the writing of agreement for Mrs. Curtis. Paid for Mrs. Curtis." Of course, there is nothing unconscionable about the preservation of these papers in itself; but, in view of the other circumstances, the lower court may well have held the belief that the defendant was continuously mindful of the doubtful validity of the contract and was gathering and saving evidence to bolster his position when it might be challenged.

The parties from their meager beginnings have amassed a considerable amount of property. The wife did not control it, except in isolated instances when she purchased certain real estate and leased the store. Even in those instances she did not act in any way in defiance of her husband. While the husband was astute in the management of their property, the wife remained for the most part uninformed. After the property was purported to be divided, the husband continued to operate as before, managing all of the business affairs while the wife assisted in the less formal work. The husband continued to make the bank deposits, even for accounts kept in the name of the wife, and to write out the checks for her. As noted in the separation agreement, the wife was to receive a new Ford automobile. A bill of sale was executed, but she never received the car. The defendant continued to use it as his own and later made an absolute gift of it to the son of the parties.

The defendant introduced evidence in support of his claims, but the trial judge believed the plaintiff, as it was within his province to do, Wilson v. Schermerhorn Oil Co., 56 N.M. 512, 245 P.2d 845, and our careful scrutiny of the record reveals no basis on which to overturn his findings.

It is apparent from a reading of the findings of the trial court that it felt the case was governed by the rule of Beals v. Ares, 1919, 25 N.M. 459, 185 P. 780. There the court construed the following statutory provision:

"Either husband or wife may enter into any engagement or transaction with the other, or with any other person respecting property, which either might, if unmarried; subject, in transactions between themselves, to the general rules of common law which control the actions of persons occupying confidential relations with each other."

Sec. 65–206, N.M.S.A.1941 Comp. This provision was taken from California and is identical with its statute, except the words, "as defined by the title on trusts" appear at the end of the California provision. 2 Kerr's Cyc.Codes of Cal.1908, Sec. 158. The California courts had declared the husband to be the trustee and

the wife the beneficiary under their statute. McDougall v. McDougall, 1902, 135 Cal. 316, 67 P. 778; Stiles v. Cain, 1901, 134 Cal. 170, 66 P. 231. Our court, however, in Beals v. Ares, supra, stopped short of declaring the husband to be the trustee for the wife, but adopted the rule from White v. Warren, 1898, 120 Cal. 322, 49 P. 129, 52 P. 723:

> "It is only in those transactions where one secures an advantage over the other that the confidential relation existing between them may be invoked, and the equitable principles laid down in the chapter of the act upon trusts be called into operation." [25 N.M. 459, 185 P. 794]

In the Beals case the husband had received a decided advantage under the division of community property between the parties. The wife received only $5,000 while the husband was to have the balance of their holdings, aggregating to a value between $100,000 and $200,000. The court declared:

> "* * * the following propositions may be accepted without question:
>
> "(1) That the transaction in question was presumptively fraudulent.
>
> "(2) That the duty devolved upon the husband to show (a) the payment of an adequate consideration, (b) full disclosure by him as to the rights of the wife and the value and extent of the community property, and (c) that the wife had competent and independ-

ent advice in conferring the benefits upon her husband."

While there are certain parallels between the instant case and the Beals case, there are two apparent differences. In the first place, under the terms of the agreement here the wife did receive a substantial proportion of the community property. The trial court found the value of her share to be $20,975, while the husband's was $57,949.35. In fact the husband received at most only $40,729.87, due to the inadvertent error of counsel for the wife and the trial court in adding the amount of the value of salt on hand, $17,219.48, twice in computing the value of the share of the husband under the agreement. The other significant difference between this case and the Beals case is the presence of actual fraud rather than presumptive fraud. In the present case the wife never consented to a separation agreement with division of property, or knew that she was signing such an agreement. She thought she was joining in a division of property solely for the purpose of reducing income taxes.

Because of the presence of actual fraud, it is unnecessary to rule whether or not the proportion of the wife's share under the agreement is low enough to bring the rule of Beals v. Ares, supra, into operation.

■ It is frequently declared that the effect of fraud in the factum, or as sometimes called, fraud in the procurement, is

to render the instrument so executed void ab initio, while fraud in the inducement renders the instrument merely voidable. 3 Pomeroy's Equity Jurisprudence, Sec. 899, pp. 543, 544 (5th ed.) states:

*"Transactions as void or voidable.*

—In dealing with the effect of fraud, the courts distinguish between those cases in which the purported instrument never had any legal inception or existence—due to the fact that one party was induced to execute an agreement totally different from that which he apparently made, or where, due to the fraud, there was no execution at all—and those cases in which the agreement was induced by fraudulent misrepresentations or concealments which in no degree make the instrument anything other than it purports to be. In the first case it is clear that the purported agreement is void *ab initio,* while in the second case the agreement is voidable at the election of the party defrauded. * * *"

Cited in support of this text is the Restatement of Contracts, Sec. 475, p. 905, which declares:

"Where there is fraud or misrepresentation by one person likely to cause and that does cause another, without negligence on his part, to believe than an act that he does is not a manifestation of assent to any transaction or is a manifestation of assent to a transaction entirely different from that that which would be created if there were no mistake as to the facts, the act does not affect his contractual relations."

See also comments and illustrations regarding this principle in the Restatement of Contracts.

Also cited to support the statement quoted above from Pomeroy is Lovato v. Catron, 1915, 20 N.M. 168, 148 P. 490, 492, L.R.A., 1915E, 451. In that case it was necessary in determining whether a trustee was the proper party to bring the action to decide whether certain assignments fraudulently obtained from beneficiaries were void or merely voidable. The opinion states:

"Therefore it is argued, if these assignments were fraudulently obtained, the trustee is still liable to the beneficiaries, the trust has not been executed, and the trustee may follow and recover the fund. Counsel overlooks, however, the distinction between contracts which are void, and those which are only voidable, by reason of fraud. This is the distinction between fraud in the factum and fraud in the inducement. In the former case the contract is void by reason of the fraud; in the latter case it is voidable, only, for the fraud. * * *

"As to the distinction between fraud in the inducement and fraud in the

factum, see 1 Page on Contracts, § 63, where it is said:

" 'The commonest form of fraud in the factum exists where an instrument in writing is drawn up and signed by one party under a false belief as to its contents, due to the fraud of the adversary party. In such case the contract is generally held to be void. Hence such a contract need not be rescinded, and the party seeking to avoid liability need not return what he has received thereunder. Thus substituting a quitclaim deed for a mortgage, or a deed for a power to collect rents, omission to read to mortgagor a clause assuming a mortgage, or inserting without the knowledge of the adversary party a clause making a certain pledge collateral security for all debts owing, instead of for the debt in question, a false statement as to the covenants in a written lease, or the amount of goods specified in a written order, or the manner of payment, each makes such instruments void. Whether fraud in the factum exists in the particular case is a question of fact.' * * *

"In section 87 (1 Page on Contracts) the author says:

" 'Fraud in the inducement exists where the defrauded party understands the identity of the adversary party, the consideration, the subject-matter, and the terms of the contract, and he is willing to enter into the contract in question; but his willingness so to enter is caused by a fraudulent misrepresentation of the adversary party as to a material fact.'

"In section 133 the author says:

" 'As affecting the validity of the contract, fraud in the inducement renders the contract voidable, not void' * * *."

■ We view the fraud practiced on the plaintiff in the present case with regard to the execution of the separation agreement with division of property as fraud in the factum and the result follows that the instrument procured thereby, under the rule of Lovato v. Catron, supra, and other authorities, is void ab initio. The trial court found the plaintiff did not know when she signed the agreement that it was or could be used against her as a permanent division of the community property. While the trial court did not specifically find the defendant represented the instrument to be for purposes of reducing their income tax, the trial court must have adopted this testimony of the plaintiff as true in view of the findings made.

■ It is frequently stated that an instrument which is void cannot be ratified. We note, however, that the modern tendency seems to be to test the effect of an instrument by whether or not it is subject to ratification at suit of the defrauded par-

ty. 44 Words and Phrases, Void, page 319, et seq., and Voidable page 343, et seq. But even if the separation agreement could have been ratified, certainly no ratification could occur under an affidavit of ratification which was itself fraudulently induced.

In Trigg v. Trigg, supra [37 N.M. 296, 22 P.2d 126], we recognized as fraudulent and voidable an agreement whereby the husband in reliance on promises of his wife to live with him and care for him, deeded to her valuable property, when at the time the wife made the inducing promises she had no intent to keep them. We quote from that opinion as follows:

"The appellant (wife) also contends that the appellee (husband) knew, and had known for a long time, that the appellant was unhappy with him, and would sooner or later get a divorce, and that he executed the deed with his eyes open. But was the judgment and consent of the appellee the day he executed the deed free and not blinded? Though his eyes may have been open, it apparently was the constant importunities and 'nagging' to convey the property that, coupled with his hope and desire to have a happy home and prevent a divorce, caused him to make the conveyance. If she was unhappy with him and he knew of it, and she conveyed to him the thought that she would be happy with him and would not secure a divorce or abandon him if

he transferred the ranch to her, and he did transfer the ranch to her, and she did abandon him after such transfer, is that not a species of fraud and deceit?"

So we view the manner in which the affidavit of ratification was secured in the present case. See Womack v. Womack, 1904, 73 Ark. 281, 83 S.W. 937, 1136, for a similar holding.

The defendant argues that the plaintiff is now barred by the statute of limitations or laches from setting aside the separation agreement, relying principally on the case of Primus v. Clark, 1944, 48 N.M. 240, 149 P.2d 535.

The trial court found the plaintiff did not discover the promises made by the defendant which induced her to sign the affidavit affirming the earlier agreement were fraudulent until the early part of 1948. The record shows that in 1942 the defendant filed an action for divorce, setting up the property division and the affidavit of ratification. In response to this action the plaintiff attacked both of these instruments as fraudulent. In view of this fact, the finding of the trial court cannot stand as to the date the plaintiff first discovered the fraud of the defendant. However, the result of this case is not affected thereby. We held in Newton v. Wilson, 1949, 53 N.M. 480, 211 P.2d 776, that limitations and laches do not run against parties while they continue in

the marital relation. There the husband and wife attempted to convert the separate estate of the wife into community property. On the death of the husband his children sought to establish a three-eighths' interest in the property. Under the declaration of this court in McDonald v. Lambert, 1938, 43 N.M. 27, 85 P.2d 78, 120 A.L.R. 250, we held the attempt to convert the separate property of the wife into community property was a nullity. That portion of the opinion has been overruled by Chavez v. Chavez, 1952, 56 N.M. 393, 244 P.2d 781, but the case still stands in respect to the contention of the plaintiffs therein that the widow was barred to assert her claim to the property because of the statute of limitations and laches. The plaintiffs there also relied on Primus v. Clark, supra, and we said [53 N.M. 480, 211 P.2d 778]:

> "The plaintiffs also attempt to avoid the doctrine of the McDonald case (McDonald v. Lambert, supra) by invoking the statute of limitations and laches. It must be kept in mind that the parties to the contract lived together as husband and wife from the time of its execution until his death. *It is the policy of the Law to prevent litigation between husband and wife, not to promote it as would be the case if the wife had to sue her husband to avoid limitations and laches.* Cary et al. v. Cary, 159 Or. 578, 80 P.2d 886, 121 A.L.R. 1371, and Bennett v. Finnegan,

et al., 72 N.J.Eq. 155, 65 A. 239. See also Annotation in 121 A.L.R. 1384, and Torrez et al. v. Brady et al., 37 N.M. 105, 19 P.2d 183, where we held that limitations do not run by adverse possession as between husband and wife. The plaintiffs cite the case of Primus v. Clark, 48 N.M. 240, 149 P.2d 535, in support of their claim that limitations and laches run as between husband and wife. The parties in that case had been divorced for more than the applicable statutory period, and in addition only one member of this court concurred with the writer of the opinion, the other three merely concurring in the result. That case is not authority here." (Emphasis ours.)

Consequently, this point must also be ruled against the defendant.

 The division of property made by the lower court appears to be substantially equal between the parties as respects the real estate, chattels, etc., however, it must be modified in certain respects. The trial court divided all of the cash bank accounts held by the defendant, one half to go to the plaintiff, while permitting the plaintiff to retain the entire amount of cash accounts standing in her name. The same rule should have been applied to the cash bank accounts of both parties, with equal division throughout. Also the court awarded to the plaintiff 80 acres of land adjacent

to the Salt Lake property and further awarded to the plaintiff the former home of the parties, together with "the improvements thereon and all fixtures and equipment thereto attached." It appears the 80-acre tract is chiefly valuable as a source of fresh water for the operation of the salt lease and that the property would be of little or no practical value to the plaintiff. The award of the improvements, fixtures and equipment with the former home of the parties would, by its terms, include certain equipment, etc., placed on the property by the defendant solely for use in connection with the salt enterprise, to-wit: Truck scales for the weighing of salt, a parts warehouse, office furnishings and equipment, a gasoline tank and pump, air compressor, tools and equipment, garages and a telephone line, together with extra poles, lines and repair parts. In our opinion, both the 80-acre tract of land and the above described equipment are reasonably necessary to the operation of the salt lease and in fairness should have been awarded to the defendant. To do otherwise would not only imperil to some extent his salt business, but would confer little benefit upon the plaintiff. Furthermore, the plaintiff specifically stated she did not know anything about the salt business and did not want it.

The case is remanded to the district court with instructions (1) to award to the defendant one half of the cash accounts standing in the name of or controlled by the plaintiff; (2) to award to the defendant the 80-acre tract of land adjacent to the Salt Lake, described as: The North half (N½) of the Southwest quarter (SW¼) of Section 31, Township 3 North, Range 18 West, N.M.P.M.; and (3) to allow the defendant to remove the above mentioned items of equipment, fixtures and improvements from the property awarded to the plaintiff, upon condition that no substantial damage is done to the realty or structures thereon, and that whatever damage is occasioned by such removal shall be repaired by the defendant. In all other respects the judgment is affirmed. Costs of this appeal shall be borne equally by plaintiff and defendant.

It is so ordered.

LUJAN, C. J., and SADLER, McGHEE and COMPTON, JJ., concur.