613 P.2d 714

**In the Matter of the ESTATE of Willie B. (Neutie) FLETCHER, Deceased, John J. Fletcher, Jr., Devisee, Appellee,**

**v.**

**William Rosson JACKSON and Robert Turner Jackson, Appellants.**

**No. 4137.**

Court of Appeals of New Mexico.

April 10, 1980.

Writ of Certiorari Denied May 16, 1980.

James E. Templeman, Templeman & Crutchfield, Lovington, for appellants.

Lowell Stout, Hobbs, for appellee.

## OPINION

WOOD, Chief Judge.

Neutie married John J. Fletcher, Jr. on December 29, 1939. Neutie died testate, July 4, 1977. Formal probate proceedings were instituted. Neutie had two sons from a prior marriage; these sons (Jackson) moved for an order including certain stock certificates in the inventory of Neutie's estate. After an evidentiary hearing, the motion was denied. The sons appeal. We discuss: (1) proof of separate ownership; (2) proof of transmutation of community property to joint tenancy between husband and wife; and (3) whether transmutation can occur absent a written agreement between the spouses.

*Proof of Separate Ownership*

The sons' motion sought inclusion, in the inventory, of 400 shares of stock in Texaco, Inc. and 749 shares of stock in the Southern Company. The trial court found that all of these shares were acquired by Fletcher by using separate funds that Fletcher had inherited from his father. The sons do not challenge this finding as to the Texaco stock or as to 584 shares of the Southern Company. The sons challenge the sufficiency of the evidence as to 165 shares of the Southern Company.

■ The parties recognize that both the Texaco and the Southern Company stock were acquired during the marriage of Neutie and Fletcher and that, initially, all of this stock was presumed to be community property. Fletcher had the burden of going forward with evidence and the burden of persuading the trial court that the stock was his separate property. These burdens would be met, and the community property presumption rebutted, by a preponderance of the evidence. *Thaxton v. Thaxton*, 75 N.M. 450, 405 P.2d 932 (1965); *Burlingham v. Burlingham*, 72 N.M. 433, 384 P.2d 699 (1963); *Campbell v. Campbell*, 62 N.M. 330, 310 P.2d 266 (1957).

Evidence Rule 301 effected no change in the application of the above rules in this case. The community property presumption, under Evidence Rule 301, imposed upon Fletcher (the party against whom the presumption was directed), the burden of proving that the nonexistence of the presumed fact is more probable than its existence. *Trujillo v. Chavez*, 93 N.M. 626, 603 P.2d 736 (1979). However, under the rules stated in the preceding paragraph, Fletcher's burden was greater than proving it was more probable that the stock was not community property than that it was; rather, Fletcher's burden was to persuade the trial court that the stock was his separate property.

■ There is evidence that Fletcher inherited a sum of money, more than enough to purchase both the Texaco and the Southern Company stocks. He established a separate "special account" with these funds. He testified that all of the stock was purchased with these separate funds. A reconciliation of deposits into, and expenditures from, the special account included the cost of purchasing the stock.

The sons' contention is based on Fletcher's inability to produce cancelled checks for the 165 shares of the Southern Company. Fletcher explained that his bank records for October and November, 1975 were missing. However, cancelled checks for both before and after this two-month period were in evidence. The missing bank records for the two-month period do not benefit the sons. The reconciliation of the special account, Fletcher's testimony that no community funds were used to purchase the stock, and Fletcher's other financial records, all point to the purchase of the 165 shares with separate funds. The officer representing the bank executor testified that the separate fund purchases were verified "all the way" through other records.

The appellate issue is whether there is substantial evidence to support the trial court's finding (of purchase from separate funds), of the 165 shares of the Southern Company. *Thaxton v. Thaxton*, supra. The evidence supporting the finding is substantial.

*Proof of Transmutation of Community Property to Joint Tenancy*

This issue involves 1718 shares of Standard (Standard Oil Co. of Indiana) stock. Fletcher testified that these shares accumulated as part of a "savings" or "retirement" program with his employer; that the certificates were issued after his retirement. The three certificates involved were issued in Fletcher's name only, while he was married. There is no claim that these shares were not community property at the time of acquisition. In November, 1976, Fletcher had this stock reissued to Neutie and Fletcher as joint tenants. This issue involves the sufficiency of the evidence to prove the transmutation. The trial court decided this issue on two grounds: (a) under the *Trimble* rule (*In re Trimble's Estate*, 57 N.M. 51, 253 P.2d 805 (1953)) and (b) under § 47–1–16, N.M.S.A. 1978.

### A. The Trimble Rule

Section 40–2–2, N.M.S.A. 1978, enacted by Laws 1907, ch. 37, § 4, and never amended, states:

> Either husband or wife may enter into any engagement or transaction with the other, or with any other person respecting property, which either might, if unmarried; subject, in transactions between themselves, to the general rules of common law which control the actions of persons occupying confidential relations with each other.

We are not concerned here with rules of common law which control the actions of persons occupying confidential relations with one another. See *Trujillo v. Padilla*, 79 N.M. 245, 442 P.2d 203 (1968); *Curtis v. Curtis*, 56 N.M. 695, 248 P.2d 683 (1952); *Beals v. Ares*, 25 N.M. 459, 185 P. 780 (1919).

Apart from such common law rules, § 40–2–2, supra, authorizes a spouse to enter *any* transaction with the other spouse, in regards to their property, which either might, if unmarried. Such language permits spouses to change the way in which property is owned.

The plain language of § 40–2–2, supra, has not, however, been applied by our Supreme Court. *Newton v. Wilson*, 53 N.M. 480, 211 P.2d 776 (1949) and *McDonald v. Lambert*, 43 N.M. 27, 85 P.2d 78 (1938) severely limited the transmutation of property, as between husband and wife. *Chavez v. Chavez*, 56 N.M. 393, 244 P.2d 781, 30 A.L.R.2d 1236 (1952) overruled *Newton* and *McDonald*, and recognized that § 40–2–2, supra, permitted transmutation of property, but subjected transmutation to an extraordinary proof requirement. *In re Trimble's Estate*, supra, stated that "transmutation must be established by clear, strong and convincing proof—more than a mere preponderance of evidence."

One part of the trial court's decision assumed this proof requirement was in effect, and held that the proof requirement had been met. We agree that if this proof requirement applies to the joint tenancy in this case, the proof requirement has been met.

The rule for determining whether the *Trimble* proof requirement has been met is stated in *Duke City Lumber Company, Inc. v. Terrel*, 88 N.M. 299, 540 P.2d 229 (1975); see also *Matter of Valdez*, 88 N.M. 338, 540 P.2d 818 (1975). The rule is: It is for the fact finder, in this case the trial court, to determine whether the proof requirement had been met; the appellate court reviews the evidence in the light most favorable to the prevailing party and determines whether the fact finder could properly have determined whether the proof requirement had been met.

In contending the evidence of transmutation was insufficient, the sons contend that Fletcher's testimony of conversations between Fletcher and Neutie was inadmissible and cannot be considered in determining the sufficiency of the evidence. We do not answer this question because the trial court's letter decision states that the conversations were not considered. Our evidence review also does not consider the conversations.

Fletcher testified that, to take care of whichever spouse survived, four specific items of property were deliberately placed in joint tenancy; that other property of the spouses would go directly to the sons, rather than to the surviving spouse, as a tax avoidance maneuver. This testimony is consistent with other evidence.

The Standard stock, other than the shares involved in this issue, was issued to Neutie and Fletcher as joint tenants. The May, 1960 signature card for a credit union savings account, signed by Neutie and by Fletcher, was, prima facie, a joint tenancy account. The deed to the home, in January, 1967, granted the property to Neutie and Fletcher as joint tenants. Fletcher testified that the checking accounts were in joint tenancy; we do not know when they were established.

The Standard stock, other than the shares involved in this issue, which was issued as joint tenancy stock, is dated in 1951, 1952, 1953, 1954 and 1964. Certificates for the contested stock were issued in 1973 and 1974; they were sent in to be reissued as joint tenancy stock in 1976. According to Fletcher, this reissuance was for the purpose of conforming to the joint tenancy plan. The only joint tenancy stock was the Standard stock; after the 1976 reissuance, all but 38 shares of Standard stock was in joint tenancy. All other stock, quite a bit as shown by the inventory, was in the name of Fletcher alone, and was handled in the estate as community property.

Neutie died of cancer; she first learned of her cancer in 1975. On May 3, 1976, Fletcher executed his will and on May 7, 1976, Neutie executed a codicil to her 1964 will. The will and codicil contained almost identical provisions—the "equity" in the home and the furnishings of the home were left to the other spouse; the sons were residual legatees under both the will and codicil. Under the 1976 will of Fletcher, his separately owned property would have gone to Neutie's sons. Fletcher testified that the purpose of Neutie's codicil was "[t]o give me the furnishings of the house," that the codicil was unnecessary in connection with the house. This codicil was consistent with Fletcher's testimony that "our intent" was to keep the joint tenancy items intact. After the May, 1976 codicil, the contested stock was sent in for reissuance as joint tenancy stock; this was done in November, 1976 and Fletcher, at the time, advised Neutie of what was being done. Neutie "seemed to be pleased about it."

Dividend checks for the reissued stock were in the name of Neutie and Fletcher as joint tenants, both endorsed the checks. One such endorsed check was deposited in December, 1976. In February, 1977, Neutie executed a new will; this new will left Fletcher $10 and a life estate in the house and furnishings. In March, 1977, Neutie endorsed and deposited another joint tenancy dividend check. Fletcher was not aware

of Neutie's will of February, 1977 until the latter part of August, 1977—about a month and one-half after Neutie's death.

*In re Trimble's Estate*, supra, refers to:

[T]he all important factor in transmutation of property by married persons which is that there must be an intention of the persons to make the transmutation and that such intention must be proved by evidence, or supported by a presumption which is not overcome by evidence to the contrary. We hold the evidence to prove the intention must be clear, strong and convincing . . . .

We do not agree with the sons' contention that the proof of Neutie's intent to transmute the contested stock was insufficient. After Neutie knew she had cancer, and four days after Fletcher's will which left very little to Neutie, Neutie executed a codicil which in turn left very little to Fletcher. These dealings by spouses of over 35 years were consistent with joint tenancy estate planning. Thereafter, Fletcher caused the contested Standard stock to be reissued in joint tenancy and Neutie was pleased. Neutie endorsed a joint tenancy dividend check even after she had changed her will without Fletcher's knowledge. Viewing the evidence in the light most favorable to the trial court's decision, the trial court could properly find that the transmutation was proved by clear, strong and convincing evidence.

### B. Section 47–1–16, supra

*In re Trimble's Estate*, supra, and *Chavez v. Chavez*, supra, added a requirement for transmutation not contained in § 40–2–2, supra; that requirement was that the transmutation must be proved by clear, strong and convincing evidence. This proof requirement seems to have been added "[t]o preserve the virility of our indigenous form of marital ownership"; that is, to preserve community property as the basic form of ownership of property by husband and wife. *In re Trimble's Estate*, supra; see Wood, *The Community Property Law of New Mexico* (1954) page 53.

Joint tenancy as a form of ownership was authorized by the Legislature in 1852. See Laws 1851–52, page 374, compiled as § 47–1–15, N.M.S.A. 1978; joint tenancy ownership had been approved by judicial decision. *Brown v. Jackson*, 35 N.M. 604, 4 P.2d 1081 (1931) states: "While it is true that joint tenancy is no longer favored, as at common law, yet it still exists when by grant it is clearly expressed that the estate is to be in joint tenancy."

The special proof requirement set forth in *Trimble*, supra and *Chevez*, supra, involved the transmutation of community property to joint tenancy, which the court had declared to be no longer in favor. The response to this judicially-declared limitation upon a legislatively-authorized form of ownership was another statute. See *Wood*, supra, page 155.

*Trimble*, supra, was decided in 1953. In 1955, § 47–1–16, supra, was enacted. It reads:

An instrument conveying or transferring title to real or personal property to two or more persons as joint tenants, to two or more persons and to the survivors of them and the heirs and assigns of the survivor, or to two or more persons with right of survivorship, shall be prima facie evidence that such property is held in a joint tenancy and shall be conclusive as to purchasers or encumbrancers for value. In any litigation involving the issue of such tenancy a preponderance of the evidence shall be sufficient to establish the same.

The wording of this statute shows that it was intended to do away with the special proof requirement when the transmutation is into joint tenancy—"a preponderance of the evidence shall be sufficient". The wording of this statute shows that it was intended to negate the statement in *Trimble*, supra, that a joint tenancy deed, standing alone, was insufficient to establish a transmutation into joint tenancy—"An instrument . . . transferring title . . . to two or more persons as joint tenants . . . shall be prima facie evidence that such property is held in a joint tenancy".

Prima facie evidence is evidence sufficient to establish the joint tenancy absent evidence to the contrary. *State v. Matamoros*, 89 N.M. 125, 547 P.2d 1167 (Ct.App. 1976). By introducing the instrument transferring title to persons as joint tenants, the proponent has introduced sufficient evidence to establish the joint tenancy; to defeat the joint tenancy, the opponent of joint tenancy must come forward with evidence to the contrary. If the opponent does this, a preponderance of the evidence is sufficient to establish the joint tenancy.

A second part of the trial court decision applied § 47–1–16, supra; it found that the sons did not establish by the preponderance of the evidence that the ownership of the contested Standard stock "was other than that as joint tenancy as shown on the face of the stock certificate." The sons assert that there is no substantial evidence to support this finding; quite clearly there is, see the evidence previously reviewed.

The sons' basic approach to § 47–1–16, supra, is that it was ineffective to change the *Trimble* requirement. Fletcher's approach to § 47–1–16, supra, is one of caution, that Supreme Court decisions seem to have refused to apply it. Fletcher's approach is consistent with note 35 to Bingaman, *The Community Property Act of 1973: A Commentary and Quasi-Legislative History*, 5 N.M.L.Rev. 1 (1974) page 18. Note 35 states that although *Trimble* was "specifically overruled" by § 47–1–16, supra, "the Court gave the statute no real effect".

We have pointed out that § 47–1–16, supra, was intended to change the *Trimble* requirement in connection with joint tenancies. We do not agree that Supreme Court decisions have refused to apply § 47–1–16, supra; rather, transmutation situations, since enactment of § 47–1–16, supra, have either not discussed this statute, or have lacked the factual basis for application of the statute. Our explanation follows.

The decisions leave one uncertain as to the type of situations to which either the preponderance of evidence rule or the *Trimble* requirement applied.

1. The first statement of the special proof requirement was in *Chavez v. Chavez*, supra. In that case, community funds had been used to purchase property, title to which was taken by husband and wife as joint tenants. The situation was the same in *Trimble*; community funds had been used for the purchase; title had been taken by husband and wife as joint tenants.

2. *Shanafelt v. Holloman*, 61 N.M. 147, 296 P.2d 752 (1956) suggests that the *Trimble* special proof requirement was inapplicable when there was a dispute as to whether community funds were used to make the purchase; that where a dispute exists as to whether community funds were involved, the community property presumption is overcome and separate ownership of the property is established by a preponderance of the evidence. See *Campbell v. Campbell*, supra, and *Conley v. Quinn*, 66 N.M. 242, 346 P.2d 1030 (1959).

3. In *Burlingham v. Burlingham*, supra, there was a dispute as to the source of funds used to purchase property taken in the name of the husband. The trial court found the funds were the separate property of the wife. The opinion referred to the absence of a finding that the property was community property, and the absence of evidence that the wife's separate property had been transmuted into joint tenancy; in this discussion, *Burlingham*, supra, refers to the *Trimble* proof requirement. This suggests that a dispute as to the funds used is not a basis for excluding the *Trimble* proof requirement. However, in *Thaxton v. Thaxton*, supra, there was a dispute as to the funds used; the funds were found to have been community funds. It was held in *Thaxton*, supra, that the proponent of separate ownership had the burden of establishing separate ownership by a preponderance of the evidence; no mention is made of the *Trimble* proof requirement. See *Paschall v. Paschall*, 79 N.M. 257, 442 P.2d 569 (1968).

4. In *LeClert v. LeClert*, 80 N.M. 235, 453 P.2d 755 (1969), the husband inherited bonds which had been placed in joint tenancy with his wife. The opinion upholds a finding of no intent to transmute this sepa-

rate property into community property; it does not refer to the proof required for transmutation. *Marquez v. Marquez*, 85 N.M. 470, 513 P.2d 713 (1973) states that if community funds are used to purchase the separate property from either spouse, the property becomes community property. *McDonald v. Lambert*, supra, is cited as authority; *McDonald* was a no transmutation decision overruled in *Chavez v. Chavez*, supra.

None of the cases in the preceding numbered paragraphs refer to § 47–1–16, supra.

■ Uncertainty as to when the *Trimble* requirement applies is resolved by the following approach: 1. A dispute as to whether property is separate or community does not, at that point, involve the *Trimble* requirement because the issue involves the initial legal status of property and not a change, as between spouses, in the legal status. 2. The initial legal status of property, as separate or community, may be established by a preponderance of the evidence. 3. Once the initial legal status of property, as separate or community, is determined, a change in the legal status is a transmutation issue and the *Trimble* requirement is involved when the change is between spouses. See *Gillespie v. Gillespie*, 84 N.M. 618, 506 P.2d 775 (1973).

■ Section 47–1–16, supra, applies specifically to joint tenancies. By its wording, it applies in determining whether the initial legal status of property was joint tenancy and in determining whether the original legal status has been changed to joint tenancy. The application of § 47–1–16, supra, in determining whether property was initially acquired as joint tenancy, effects no change in the often stated rule that the status may be established by a preponderance of the evidence. The application of § 47–1–16, supra, in determining whether the initial legal status has been transmuted to a joint tenancy, changes the *Trimble* requirement, and the legislative intent was to effect that change. *Kinney v. Ewing*, 83 N.M. 365, 492 P.2d 636 (1972) states that the use in § 47–1–16, supra, "of 'prima-facie evidence,' 'conclusive' and 'preponderance

of the evidence,' clearly demonstrates the purpose of the legislature to deal with evidentiary matters, *including the required quantum of proof*, with specificity in relation to joint tenancies." (Our emphasis.)

The only case cited in support of the view that the Supreme Court has refused to give effect to § 47–1–16, supra, is *Wiggins v. Rush*, 83 N.M. 133, 489 P.2d 641 (1971). In *Wiggins*, supra, there was a dispute as to the legal status of funds used to purchase property. That dispute was resolved by a finding that these funds were community property. The property purchased with community funds was taken in joint tenancy. Relying on (a) the use of community funds for the purchase, (b) and the intention not to hold as joint tenants, the trial court ruled that a joint tenancy had not been created. This same result would have been reached by recognizing a prima facie joint tenancy under § 47–1–16, supra, with contrary evidence, amounting to a preponderance, which overcame the prima facie case.

*Wiggins*, supra, refers to *Trimble* as support for the view that the joint tenancy deed was not controlling; the deed is also not "controlling" under § 47–1–16, supra, which makes the deed no more than prima facie evidence sufficient to establish a joint tenancy in the absence of other evidence. The characterization in *Wiggins*, supra, of the evidence of no joint tenancy as "clear and convincing" does not fit under either *Trimble* or § 47–1–16, supra; the extraordinary proof requirement of *Trimble* was to establish the joint tenancy, not to negate the joint tenancy; § 47–1–16, supra, requires only a preponderance of proof.

The *Wiggins*, supra, decision may be characterized as no more than a failure to establish a contested joint tenancy by a preponderance of the evidence. Neither the language used, nor the decision in *Wiggins*, supra, shows a refusal to apply § 47–1–16, supra.

■ The trial court properly utilized § 47–1–16, supra, in deciding whether the contested Standard stock was held in joint

tenancy, and its finding of joint tenancy, being supported by a preponderance of the evidence, was correct.

*Whether Transmutation Can Occur Absent a Written Agreement Between the Spouses*

■ The sons contend that a husband and wife can no longer transmute property, between themselves, by meeting the requirements of *Trimble*, supra, or § 47–1–16, supra. They assert that since enactment of the Community Property Act of 1973, transmutation between spouses can only occur by a written agreement between the spouses. The sons rely on § 40–3–8, N.M.S.A. 1978, which reads:

A. "Separate property" means:

(1) property acquired by either spouse before marriage or after entry of a decree of dissolution of marriage;

(2) property acquired after entry of a decree entered pursuant to Section 40–4–3 NMSA 1978 unless the decree provides otherwise;

(3) property designated as separate property by a judgment or decree of any court having jurisdiction;

(4) property acquired by either spouse by gift, bequest, devise or descent;

(5) property designated as separate property by a written agreement between the spouses; and

(6) each spouse's undivided interest in property owned in whole or in part by the spouses as cotenants in joint tenancy or as cotenants in tenancy in common.

B. "Community property" means property acquired by either or both spouses during marriage which is not separate property.

C. "Property" includes the rents, issues and profits thereof.

D. The right to hold property as joint tenants or as tenants in common and the legal incidents of so holding, including but not limited to the incident of the right of survivorship of joint tenancy, are not altered by the Community Property Act of 1973 [40–3–6 to 40–3–17 NMSA 1978], except as provided in Sections 40–3–10, 40–3–11 and 40–3–13 NMSA 1978.

The sons claim that paragraph A(5) requires a written agreement between the spouses in order for a transmutation to occur. In support of this argument, they cite us to the discussion of this provision in *Bingaman*, supra, pages 5–6. *Bingaman* points out that the transmutation section, § 40–2–2, supra, remained in effect after passage of the 1973 Act and that under § 40–2–2, supra, the spouses could agree "at any time before or during marriage that property which would otherwise be community property is instead the separate property of one or both of them." *Bingaman* states that § 40–2–2, supra, was

modified somewhat by this subsection, which specifies that such agreements between the spouses *must be in writing*, a requirement which was added to prevent misunderstandings and the possibility of fraud. If an agreement to transmute community property into the separate property of one or both spouses was not written at the time it was made, the spouses are free to reduce the agreement to writing at a later time. If they subsequently cannot agree either as to the existence of the agreement or to its terms, this subsection leaves the property in question as community property. Such a result seems fairer to both spouses than does placing on one of them the risk of losing all interest in the property in a later court test, the outcome of which could depend only upon testimony involving differing recollections of a past oral agreement. (Our emphasis.)

We agree neither with the sons nor with the quotation from *Bingaman*, supra. The possibility of one spouse defrauding another in connection with a transmutation exists whether or not there is a written agreement between the spouses; the protection against fraud is in the requirement of § 40–2–2, supra, subjecting transactions between spouses to common law rules controlling actions of persons occupying confidential relations with each other.

The heading of § 40–3–8, supra, is "Classes of property" and this heading was enacted by the Legislature. Laws 1973, ch.

320, § 3. Section 40–3–8, supra, by its terms, deals with classes of property and not with how property may be changed to a different class. If, as *Bingaman*, supra, contends, an agreement between spouses, to transmute property "must be in writing" then, absent such a writing, a gift of separate property, from one spouse to the other, or a gift by the community to one spouse would not be effective. The gift provision, § 40–3–8(A)(4), supra, makes no reference to a writing. The cotenancy provision, § 40–3–8(A)(6), supra, which declares as separate property each spouse's undivided interest as a joint tenant or tenant in common, does not state that such cotenancies, as between spouses, may only be established by their written agreement. Section 40–3–8(D), supra, states that the right to hold property, as joint tenants, is not altered by the Community Property Act of 1973 except as provided in sections not applicable to this case.

Section 40–3–8(A), supra, defines separate property; § 40–3–8(A)(5), supra, permits spouses to agree in writing that certain property is separate property. Such an agreement might effect a transmutation, but this is no more than an indirect consequence of the statutory definition; § 40–3–8, supra, does not deal directly with the transmutation issue, as *Bingaman*, supra, recognizes at page 24 (note 50), and page 51.

Section 40–3–8(A)(5), supra, neither prohibits nor adds to the requirements for transmutation under § 40–2–2, supra, and § 47–1–16, supra, nor does it change the *Trimble* requirement applicable to a transmutation not covered by § 47–1–16, supra.

The order of the trial court denied the motion to include the stock, identified in this opinion, in the inventory of Neutie's estate. The order also held that this stock was not distributable under Neutie's will. The order is affirmed.

IT IS SO ORDERED.

WALTERS, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent with reference to the 1718 shares of stock in Standard Oil Company.

On May 9, 1973 and December 16, 1974, Fletcher received a total of 1718 shares of stock of Standard Oil Company in his name alone. These shares were community property. On November 10, 1976, and November 22, 1976, by letter sent to transfer agents, Fletcher received the 1718 shares of stock in joint tenancy named with Neutie Fletcher, his wife. This recital on the certificates conferred a separate estate in the stock on each of them, the survivor to own all the stock.

Fletcher learned that his wife had cancer in June of 1975, over a year before the transmutation occurred. On February 19, 1977, 3 months after the transmutation, Neutie executed her Will in which she bequeathed and devised to her sons by a previous marriage, the residue of her estate. Neutie died July 4, 1977. Fletcher had no knowledge of this Will until August, 1977, a month thereafter.

The only testimony and evidence presented to establish the transmutation of the shares from community to joint tenancy was that of Fletcher. The record is silent as to the lawyer who prepared the Neutie Will. The contest of the ownership of the shares of stock began April 18, 1978. The silent witness, if available, would probably have knowledge of any joint tenancy plan testified to by Fletcher and whether Neutie approved the transmutation at the time of the execution of her Will or prior to her death. The record is silent as to whether Neutie believed the 1718 shares of Standard Oil were held as community property or in joint tenancy. There were extensive holdings in stocks but the Will is devoid of any mention of disposition. A reasonable inference can be drawn that Neutie believed all of the stocks were held as community property. If not, some mention would have been made of the fact that Standard Oil shares were held in joint tenancy.

It is difficult for me to understand why the parties and their attorneys did not

make available the knowledge of the silent witness or explain the reasons if such knowledge were unavailable.

Fletcher's testimony relative to conversations with Neutie, admitted over objection, were self-serving declarations. Regardless of its relevancy or materiality, this testimony was not competent evidence. *Brown v. General Ins. Co. of America*, 70 N.M. 46, 369 P.2d 968 (1962); *Nichols v. Sefcik*, 66 N.M. 449, 349 P.2d 678 (1960). His testimony in this respect cannot be relied upon to reach a fair result.

Section 47–1–16, N.M.S.A. 1978 reads in pertinent part:

> An instrument . . . transferring title to . . . personal property to two . . . persons as joint tenants . . . shall be prima facie evidence that such property is held in joint tenancy and shall be conclusive as to purchasers or encumbrancers for value. *In any litigation involving the issue of such tenancy* a preponderance of the evidence shall be sufficient *to establish the same.* [Emphasis added.]

This language means that the shares of stock received by Fletcher in joint tenancy were prima facie evidence thereof in the absence of litigation. As to purchasers or encumbrancers for value, it was conclusive that Fletcher held the shares in joint tenancy. But if the prima facie fact of joint tenancy is disputed in court, Fletcher must "establish the same" by a preponderance of the evidence. The instrument is not sufficient evidence to establish the joint tenancy absent evidence to the contrary. *State v. Matamoros*, 89 N.M. 125, 547 P.2d 1167 (1976) cited in the majority opinion is not applicable for the meaning of the language set forth in § 47–1–16.

The question for decision is whether Fletcher established the joint tenancy by a preponderance of the evidence.

The mode of acquisition of the stock in joint tenancy was by two letters signed and sent to transfer agents by Fletcher alone. Neutie never saw the letters.

The stock certificates were prepared and executed in joint tenancy by Standard Oil without the knowledge or consent of Neutie. It is necessary, not merely that the certificates contain language creating such an estate. It must further appear that the certificates were accepted by Neutie whose property it was sought to bring within its terms, knowing that it contained that provision for joint tenancy. If not shown, then joint tenancy must be established by proper extrinsic evidence. To hold the mere insertion in the certificate of joint tenancy language would be binding on Neutie and deprive her and her heirs of her interest in the property would not only defeat the community property law in that instance but result in an absolute injustice to an innocent party. Fletcher had to prove that Neutie knew that the certificate so provided. *Baldwin v. Baldwin*, 50 Ariz. 265, 71 P.2d 791, 795 (1937), quoted *In re Trimble's Estate*, 57 N.M. 51, 61, 253 P.2d 805 (1953).

Our duty is to view these acts in light of § 40–2–2, N.M.S.A. 1978. It reads in pertinent part:

> Either husband or wife may enter into any engagement or transaction with the other . . . respecting property . . subject . . . to the general rules of common law which control the actions of persons occupying confidential relations with each other.

This statute does not state whether the engagement or transaction shall be oral or in writing. They were first empowered to make any contract they saw fit regarding their property. But, as shown ante, under § 40–3–8(A)(5), N.M.S.A. 1978, this subsequent statute provided for "a written agreement," and we are now bound by that fact. There was no written agreement. Nevertheless, we shall point to the law that affects parties in a confidential relationship.

The general rules of common law which control the actions of persons occupying confidential relations have been stated in many opinions. *Beals v. Ares*, 25 N.M. 459, 185 P. 780 (1919); *Harrison v. Harrison*, 21 N.M. 372, 155 P. 356, LRA 1916 E. 854 (1916); *Trujillo v. Padilla*, 79 N.M. 245, 442

P.2d 203 (1968); *Iriart v. Johnson*, 75 N.M. 745, 411 P.2d 226 (1965). The parties must exercise the utmost good faith. If one party secures an advantage over the other, the transaction is presumptively fraudulent, and where a fiduciary duty has been violated, the transaction is void as against public policy. The burden is on the husband in all transactions between them to show the fairness of the transaction, the adequacy of the consideration, the absence of fraud and undue influence, and that the wife had competent and independent advice in conferring benefits upon her husband. *Beals, supra.* A husband dealing with his wife concerning property rights is bound to absolute good faith. This means honesty of purpose and integrity of conduct with respect to this subject matter, without any culpable motive or intent. There must be an honest intention not to take any unconscionable advantage of another. Where the community status has attached to the property, it cannot be changed or affected by the act of one spouse to the prejudice of another.

"In short, a husband, by reason of the marital relation, is bound in his dealings with his wife to the highest and best of good faith, and as a consequence is obligated in such dealings not to obtain and retain any advantage over her resulting from concealment or adverse pressure, and he must, if he would avoid the presumption of undue influence emanating from the procurement of any advantage over her, *make full and fair disclosure to her of all that she should know for her benefit and protection concerning the nature and effect of the transaction, or else he must deal with her at arm's length and as he would with a stranger, all the while giving her the opportunity of independent advice as to her rights in the premises.*" [Emphasis added.] *In re Cover's Estate*, 188 Cal. 133, 204 P. 583, 588 (1922); *Norris v. Norris*, 50 Cal.App.2d 726, 123 P. 847 (1942).

Under these rules, a transaction between husband and wife is watched with extreme jealousy and solicitude. If there be the slightest trace of undue influence or unfair advantage, redress will be given to the injured party. In fact, it is considered so suspicious as to cast the burden of proof upon the person who seeks to support it to show that he has taken no advantage of his influence or knowledge, and that the arrangement was fair and conscientious. *Shapiro v. Shapiro*, 424 Pa. 120, 224 A.2d 164 (1966); *Bohn v. Bohn*, 455 S.W.2d 401 (Tex.Civ.App.1970). In *Bohn* the court cited *Beals* as authority and said:

Where a gift from the wife to the husband is attacked, the question of whether the wife had competent independent advice is deemed most important, and, in some jurisdictions decisive. [Authorities omitted].

These rules apply generally to cases where a confidential relationship is established by evidence. [Authorities omitted.] [Id. 406.]

These rules were adopted because "[w]e recognize that the most dominant influence of all relations is that of the husband over the wife." *Griffin v. Griffin*, 125 Vt. 425, 217 A.2d 400, 414 (1965).

A one-half interest in community property owned by husband and wife is vested in the wife. *Reed v. Nevins*, 77 N.M. 587, 425 P.2d 813 (1967). Fletcher, with knowledge that his wife had cancer, transmuted her one-half interest in the Standard Oil stock from a vested community interest into joint tenancy. The only purpose reasonably deduced therefrom was to obtain full ownership of the stock to the exclusion of his wife's sons. Fletcher had seen Neutie's 1964 Will in which she devised and bequeathed the rest and remainder of her property of every kind and character to her sons. This bequest would have included her vested one-half interest in the Standard Oil stock.

When Fletcher alone transmuted Standard Oil stock from community property to joint tenancy, he secured an advantage over Neutie who was without competent independent advice. Absent self-serving declarations, there is no competent, substantial evidence that Neutie intended to confer this benefit upon Fletcher. Fletcher's conduct was presumptively fraudulent and was not

made in good faith for the mutual benefit of both parties. This conclusion is reached from the fact that Fletcher knew that Neutie suffered with cancer and impending death. The law looks with extreme jealousy and suspicion upon a transaction between husband and wife without her free consent, affirmatively shown.

Finally, we must construe § 40–3–8(A)(5) which reads:

"Separate property" means:

\* \* \* \* \* \*

(5) property designated as separate property by a written agreement between the spouses . . . .

This provision is simple and clear. "Separate property" is a classification wherein property otherwise acquired or held can be declared to be "separate property" by written agreement of the spouses, in which agreement, the property is described and stated to be "separate property." The purpose of this provision is to enable spouses to transmute property in writing to give it the definiteness and certainty that flows for the description and designation of the property as "separate property."

If Fletcher and Neutie had both signed the letters to the transfer agents and stated to them that the shares enclosed were held as community property, that the spouses agreed that the shares be issued to them in joint tenancy and to the survivor of them as "separate property," the shares issued would fall within the (A)(5) classification.

If the spouses agreed that one-half of the shares of stock be issued to each of them and designated thereon as "separate property," the shares issued to each of them would fall within the (A)(5) classification.

I agree with *Bingaman*, cited in the majority opinion, that "such agreements between the spouses must be in writing." To hold otherwise would be to delete from (A)(5) the words "by a written agreement." The explanation thereof in the majority opinion does not justify the deletion of those words.

Section 40–2–2 and (A)(5) read together require an engagement or transaction between the spouses to be in writing and subject to the confidential relationship.

Fletcher's transmutation of the shares of stock of oil was not accomplished "by a written agreement."

This appeal should be reversed.